# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CR  16-1089 MV |
| vs. | ) | |
| | ) | |
| **OLLISHA N. EASLEY,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>RESPONSE OF THE UNITED STATES TO DEFENDANT'S<br>MOTION TO SUPPRESS EVIDENCE</u>

The United States hereby submits this response in opposition to the Defendant's Motion to Suppress Evidence.  The facts and circumstances regarding the Defendant's encounter with Special Agent (SA) Jarrell W. Perry of the Drug Enforcement Administration (DEA) establish that his interaction with her, his search of her possessions and a suitcase she professed not to have possessory interest in and the statement that he ultimately developed with her were both consensual and voluntary.

As the Defendant freely gave SA Perry her consent to search her belongings, a warrant in this context became unnecessary.  Further, the Defendant initially, at the time of the search of a suitcase containing narcotics, claimed no ownership of the offending suitcase.  Once SA Perry received permission from the Defendant to search the Defendant's pillow, backpack and a checked-in suitcase, neither of which contained contraband, and a suitcase checked-in on the Defendant's reservation and transported by the Defendant which the Defendant originally disclaimed a relationship to in which SA Perry discovered an approximate 4.05 kilograms of

methamphetamine, he had probable cause to arrest the Defendant.[1] Following his arrest of the Defendant, SA Perry developed a voluntary statement from the Defendant which was memorialized by a recording and which was prefaced by the Defendant being informed of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Following the advisement of her *Miranda* rights, the Defendant waived those rights.

## SUMMARY OF THE FACTS

On March 10, 2016, Drug Enforcement Administration (DEA) Special Agent (SA) Jarrell W. Perry reviewed a Greyhound Bus Passenger List which revealed two different passenger names traveling on the same reservation, the Defendant, Ollisha Easley and a "Denise Moore," the list reflecting travel from Claremont, California to Louisville, Kentucky – travel paid for by way of cash payment. SA Perry observed that the reservation number for the Defendant and "Moore" was identical, which meant that both the Defendant and "Moore" were purported to be traveling on the same reservation together. The Greyhound passenger list identified both the Defendant and "Moore" as each having one piece of checked-in luggage.

Following review of the Greyhound Bus Passenger List, SA Perry and DEA SA Scott Godier went to the Greyhound Bus Station located at 320 First Street, Albuquerque, New Mexico, to meet the eastbound Greyhound bus which makes a regularly scheduled stop in Albuquerque.

After the eastbound bus had arrived that morning and the bus' passengers had disembarked the bus for the bus' cleaning and refueling , SA Perry and SA Godier observed the bus' checked-in luggage located in the bus' underside compartment. SA Perry noted a grey

---

[1] Special Agent Perry has previously been falsely accused of pre-searching bags at the Greyhound Bus terminal. *See* Order Denying Motion to Suppress, Document 43, *United States v. Moreno-Rubio*, 13-3140 JH.

2

colored *Rome Essentials* brand suitcase with a luggage tag attached to it displaying the name of the Defendant and a black-tan colored *G* brand suitcase with a luggage tag attached to it displaying the name of "Denise Moore."  Both the Defendant's and "Moore's" suitcases had luggage check-in tags attached which identified an origination city of Claremont, California and a destination city of Louisville, Kentucky – both suitcases also identified an identical contact telephone number.

Later, SA Perry, with his recording device activated,[2] boarded the bus and approached an individual, later identified as the Defendant, Ollisha Nicole Easley.  The Defendant was seated in her seat on the bus when SA Perry asked for and received permission from the Defendant to see her bus ticket.  This bus ticket revealed the Defendant's name, Ollisha Easley, and reflected travel from Claremont, California to Louisville, Kentucky.  After reviewing the Defendant's bus ticket SA Perry returned it to her. SA Perry then asked the Defendant if she was traveling with anyone else to which the Defendant answered that she was not traveling with another.

SA Perry asked the Defendant if she had any luggage with her on the bus and the Defendant identified a backpack and pillows that she had with her as items that belonged to her as well as a checked-in suitcase.  SA Perry developed the conversation further by asking the Defendant for permission to search her backpack, pillows and checked-in luggage for contraband.  The Defendant assented to the search and the consensual search of the items described above revealed no items of contraband.  In searching the Defendant's checked-in suitcase, SA Perry got off of the bus and went to the bus' exterior, underneath baggage compartment. Then he re-boarded the bus, connected again with the Defendant and asked her if he could please speak with her outside the bus for a second.

---

[2] The duration of SA Perry's engagement with Greyhound bus passengers lasted a duration of approximately 28:30 minutes of which approximately 2:52 minutes were taken with the Defendant outside the bus and approximately three minutes were taken with the Defendant on board the bus.

Next, SA Perry took investigatory steps to determine the reality and whereabouts of the aforementioned passenger described as "Denise Moore."  These investigatory steps revealed the concept of "Denise Moore" being a phantom passenger.  SA Perry knew from his DEA SA experience that when two passengers have purchased bus tickets on the same reservation number and check two pieces of luggage there is a criminal contraband strategy afoot.  The dynamic of this strategy has the one traveling passenger – in this case, the Defendant – transporting and delivering the non-traveling person's luggage which contains illegal narcotics.

SA Perry spoke with the Defendant about her relationship with the *G* brand suitcase with its associated name of "Denise Moore."  The Defendant stated that she bought the bus ticket herself, did not know "Denise Moore", did not know who the suitcase belonged to, did not care about the suitcase and that no one had given her the suitcase to transport.  The Defendant got back on the bus and SA Perry went to the bus driver to find out if the driver had a "Denise Moore" traveling on the bus.  The bus driver, after reviewing Greyhound passenger records, told SA Perry that the passenger records did not include a traveling passenger by the name of "Denise Moore."

SA Perry then concluded that the *G* brand suitcase was traveling with the Defendant and that the Defendant had abandoned the *G* brand suitcase and accordingly searched it on the bus station's platform.  This search, assisted by SA Perry's unzipping of the suitcase's lining, uncovered two clear plastic heat-sealed bundles which had been concealed underneath the inner lining of the suitcase.  SA Perry knew from his DEA SA experience that the two clear plastic, heat-sealed bundles were consistently packaged with illegal narcotics.  SA Perry then cut into one of the bundles and the cutting exposed a clear crystal-like substance signaling the presence of crystal methamphetamine.

SA Perry then went back on board the bus and placed the Defendant under arrest and transported her to the DEA Albuquerque District Office (ADO). SA Perry's work, mindful of Greyhound Bus Lines' On Time Performance ethos, did not detrimentally delay the bus' departure, nor aggravate passengers who appeared to enjoy speaking with him.  (From the first moment that SA Perry engaged Greyhound bus passengers until the moment he concluded his engagement with Greyhound bus passengers, a period of approximately 28:30 minutes elapsed.) In his engagement with the Defendant, both the Defendant and SA Perry spoke pleasantly and politely with each other, interaction marked with mutual courtesy.

At the ADO, prior to her processing, SA Perry placed the Defendant in a holding cell. Then he took the items that had been seized at the bus station to an upstairs ADO processing room where the items were photographed and tested.  SA Perry removed the two clear plastic heat-sealed bundles from the *G* brand suitcase, cut into both bundles and in this cutting again discovered a clear crystal-like substance.  SA Perry weighed the two bundles and the weight came to approximately 4.05 gross kilograms (9.072 gross pounds) – a weight consistent with a distribution amount.  SA Perry field-tested the recovered substances and the field-tests revealed a positive reaction for the presence of methamphetamine.  Following this, SA Perry went back downstairs at the ADO and placed the methamphetamine in a temporary drug vault.  On his way to the temporary drug vault, with the methamphetamine carried in his hands, he passed the Defendant in her holding cell.

After he placed the narcotics in the temporary drug vault, SA Perry processed the Defendant.  When her processing concluded, SA Perry interviewed the Defendant that afternoon in the ADO interview room – an interview, audio-video recorded, that lasted approximately 44:04 minutes.

At the inception of the interview, SA Perry outlined for the Defendant her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  The Defendant asked SA Perry "If I answer questions now, then if I answer questions with a lawyer here how long would that be?"  SA Perry responded by saying "I really don't understand what you're asking."  And the Defendant then replied "How long will it be to answer questions with a lawyer here?"  SA Perry told the Defendant that if she wanted an attorney then he would stop asking her questions and the interview would terminate until an attorney connected with her.  At this point the Defendant said "Alright, I'm ready."  When SA Perry asked her what that meant, she said that she was ready to talk and after listening to her *Miranda* rights she waived them and consented voluntarily to giving a statement.

In the course of her statement, the Defendant stated that she was responsible for transporting the *G* brand suitcase from Claremont, California and delivering it to Louisville, Kentucky and that she was to be paid $1,000.00 and possibly more for the transport and delivery of what she believed to be illegal narcotics.  When asked about "Denise Moore," she said that she had made the name up.  She stated that she had flown by Southwest Airlines from Louisville, Kentucky to Ontario, California where she made contact with a woman who took her to an apartment where she watched as the woman and another packaged the narcotics for transport back to Louisville by way of Greyhound.  Her handlers gave her cash and told her to buy two Greyhound bus tickets, one in her name and one in the name of a fictitious

passenger who would be linked to the *G* brand suitcase in which the narcotics would be concealed.

Near the end of her statement, SA Perry observed that the Defendant's mobile phone had been vibrating repeatedly during the course of the interview. SA Perry asked her if she would give consent to his searching her phone and the Defendant consented to his search of her phone. SA Perry observed the name "Baby" showing on the phone and he asked her about "Baby." Asking about "Baby" struck the wellspring of a maternal chord with the Defendant who began weeping and told SA Perry that "Baby" was her son and that she was scared that she would not see her children. SA Perry went to get the Defendant a tissue and tried to comfort her by saying that "We can't go back and change anything, the only thing you can do is help yourself now." He also said that he didn't make the decisions about what would happen with her but that judges, pre-trial service officers and the probation office would fulfill a large role in making those decisions.

The contact between SA Perry and the Defendant on March 10, 2016, from its first moment on board the Greyhound bus until the conclusion of her interview later that day had a pleasant, conversational character. Though obviously and understandably distraught – especially at the moment when reference of her son surfaced – the Defendant in her interview with SA Perry, despite the circumstances of their crossing of paths, exhibited some meaningful degree of comfort.

## **STATEMENT OF THE LAW**

### I. Consensual Encounters

A consensual encounter is simply the voluntary cooperation between a citizen and a police officer. *Michigan v. Chesternut*, 486 U.S. 567, 574-576 (1988). Accordingly, consensual

encounters are not seizures for the purposes of the Fourth Amendment and are assessed under the totality of the circumstances.  In order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests.  *See Florida v. Bostick*, 501 U.S. 429, 439 (1991).  That rule applies equally to encounters that take place on planes, trains, and city streets.  *Id*.

Thus, an encounter is deemed consensual if the defendant is "free to leave at any time during the encounter."  *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996).  However, when a person is in a confined space the analysis turns on whether a person would feel free to decline an officer's request or otherwise feel free to terminate the encounter.  *Bostick*, 501 U.S. at 434.

The Tenth Circuit has identified three categories of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. Torres–Guevara*, 147 F.3d 1261, 1264 (10th Cir. 1998); *see also United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006).

When determining whether a "seizure" has occurred, courts consider whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Thus, "[o]nly when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a seizure has occurred." *Id.* at 552. If there

8

was no seizure, but instead the encounter was consensual, the Fourth Amendment is not implicated. *See Lopez*, 443. F.3d at 1283. The subjective state of mind of the suspect or the officer "is wholly irrelevant and plays no role in [the court's] evaluation of the circumstances surrounding the encounter." *United States v. Abdenbi*, 361 F.3d 1282, 1292 (10th Cir. 2004).

The Tenth Circuit considers several factors in determining whether a police-citizen encounter becomes a seizure: (1) the location of the encounter, "particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; [(2)] whether the officers touch or physically restrain the defendant; [(3)] whether the officers are uniformed or in plain clothes; [(4)] whether their weapons are displayed; [(5)] the number, demeanor and tone of voice of the officer; [(6)] whether and for how long the officers retained the defendant's personal effects, such as tickets or identification; [(7)] and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent." *United States v. Zapata*, 997 F.2d 751, 756 (10th Cir.1993); *see also United States v. Lopez*, 443 F.3d 1280, 1284 (10th Cir. 2006) (applying same factors); *United States v. Hill*, 199 F.3d 1143, 1147, 48 (10th Cir. 1999) (same).

Courts have identified several factors that could lead to a reasonable innocent person to believe she is not free to disregard the police officer, including:  the threatening presence of several officers, the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or small enclosed space; and absence of other members of the public.  *See United States v.*

*Mendenhall*, 446 U.S. 544, 554 (1980); *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984); and

*United States v. Zapata*, 997 F.2d 751, 757 (10th Cir. 1993).

Particular personal traits or subjective state of mind of a defendant are irrelevant to the

objective "reasonable person" test, other than to the extent they may have been known to the

officer and influenced his conduct. *Zapata,* 997 F.2d at 757. In addition, a defendant's failure to

limit the scope of a general authorization to search, and failure to object when the search exceeds

what he later claims was a more limited consent, is an indication that the search was within the

scope of consent. *See*, *e.g.*, *United States v. Pena,* 143 F.3d 1363, 1368 (10th Cir. 1998); *United*

*States v. Sanchez,* 89 F. 3d 715, 719 (10th Cir. 1996).

The Fourth Amendment permits law enforcement to approach an individual in a public

place, identify himself as a law enforcement officer, and ask questions. *Florida v. Royer*, 460

U.S. 491, 4976 (1983). The permissibility of this conduct does not depend on any level of

suspicion of the person being approached; they may pose questions, ask for identification, and

request consent to search luggage-provided they do not induce cooperation by coercive means.

*United States v. Drayton*, 536 U.S. 194, 201 (2002).[3] Whether an encounter is consensual is

determined by the totality of the circumstances. *United States v. Spence*, 397 F.3d 1280, 1283-

1284 (10th Cir. 2005) (an explicit advisement that a person has a right to terminate the encounter

or refuse consent is merely one factor and is not required).

II. Consent to Search

There is no controlling significance with respect to whether a person knows she has the

right to refuse consent or not. *United States v. Watson*, 423 U.S. 411, 424 (1976). Moreover, the

---

[3]    An officer's subjective intentions are irrelevant for the purposes of Fourth Amendment
analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Santana-Garcia*,
264 F.3d 1188, 1192 (10th Cir. 2001) (an officer's subjective belief as to probable cause is not
dispositive as to the lawfulness of the arrest).

law recognizes that there is an inherent pressure when someone is subjected to the scrutiny of law enforcement and assumes that a reasonable person can still exercise a free choice.  *Id*. at 535.

The Tenth Circuit has articulated a two-step test for determining the validity of consent: "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) the government must prove consent was given without duress or coercion, express or implied."  *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (internal quotation marks omitted).  The question whether a consent to search is the product of duress or coercion is determined by the totality of the circumstances.  *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011).  Relevant considerations include:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

> *Id*.

III. Law Enforcement Encounters With Bus Passengers

In *Drayton*, the Supreme Court recognized that the Fourth Amendment "permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse." *Drayton*, 536 U.S. at 197.  The Court also stated that, "[i]n a society based on law, the concept of agreement and consent should be given a weight and dignity of its own."  *Drayton*, 536 U.S. at 207.  Further, the Court noted that "[p]olice officers act in full accord with the law when they ask citizens for consent.  It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes

place, it dispels inferences or coercion." *Id.  See United States v. Correa*, 641 F.3d 961, 966 (8th Cir. 2011) (in encounter with bus passenger, officers followed the same procedure used in *Drayton*); *United States v. Williams*, 365 F.3d 399, 404 (5th Cir. 2004) (bus passenger was lawfully encountered in bus terminal and gave voluntary consent to search of bag).

Law enforcement may handle luggage without a warrant, though they cannot feel a bag in an exploratory manner.[4]  *See Bond v. United States*, 529 U.S. 334 (2000), *United States v. Nicholson*, 144 F.3d 632, 637 (10th Cir. 1998) (the circuits uniformly agree that mere touching of a bag on the exterior does not necessarily constitute a search); *United States v. Tapia*, 306 F.3d 1283 (10th Cir. 2002) (plainclothes officers did not violate the Fourth Amendment where drug detection dog sniffed luggage in lower baggage compartment prior to encounter with Greyhound bus passenger on board the bus);  *United States v. Garcia*, 849 F.2d 917, 919 (5th Cir. 1998) (removing bags from conveyor belt and compressing them for a sniff did not constitute a search).  *United States v. Garcia*, 42 F.3d 604 (10th Cir. 1994) (no Fourth Amendment violation where dog sniffed luggage in train's baggage car); *United States v. Gault,* 92 F.3d 990*,* 992 (10th Cir. 1996) (no search where agent kicked and lifted bag).

IV. The Scope of a Consent To Search

In *United States v. Anderson*, 114 F.3d 1059, 1065 (10th Cir. 1997) (internal quotation omitted), the Tenth Circuit stated that "the scope of a search is generally defined by its expressed object, and is limited by the breadth of the consent given."  The objective reasonable person test

---

[4]  Law enforcement, thus, may move and lift luggage and check for luggage tags, all without a warrant, since any passenger would reasonably expect that another passenger might handle their bag in such a manner.  *See United States v. Jacobsen*, 446 U.S. 109, 113 (1984).  *See also*, *Florida v. Jardines*, 133 S.Ct. 1409, 1419 n.2 (2013) (Justin Kagan declaring that they all could agree that a human sniff is not a search).

is utilized to determine what a typical person would have understood between the officer and the consenting person. *Id*. (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

Any limitation on the extent of a consent to search must come from the person consenting, and not from law enforcement. *See United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) ("We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search …is an indication the search was within the scope of the consent."); *Florida v. Jimeno*, 500 U.S. at 251 (defendant gave officer consent to search and did not place any explicit limitation on the scope of the search). The scope of a consent to search is determined by the totality of the circumstances. *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999).

## **ARGUMENT**

I.   The Defendant Consented To Speak With SA Perry And To The Search of Her Suitcase, Her Consent Was Valid And The Search And Seizure of The *G* Brand Suitcase Containing The Narcotics Was Valid As The Suitcase Was Abandoned Property

A defendant's consent need not be verbal, and a defendant's failure to object when the search exceeds what he later claims was a more limited consent is an indication the search was within the scope of consent.[5]   In this case, however, the Defendant gave explicit consent to speak with SA Perry and to the search of her backpack, her pillow and her suitcase that was in the underneath luggage compartment of the bus.

The Tenth Circuit has provided a list of factors to determine if an interaction was consensual.   Drawing upon the Supreme Court case of *Drayton*, the Tenth Circuit has noted the following to be relevant:

---

[4].   *Guerrero*, 472 F.3d at 789 (10th Cir. 2007); *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999).

the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor, and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identifications; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*United States v. Thompson*, 546 F.3d 1223, 1227 (10th Cir. 2008).

The above-referenced factors, when applied to the facts and circumstances of this case, weigh in favor of determining that the Defendant gave voluntary consent to speak with SA Perry and to his search and seizure of her personal effects. The Defendant was on a public bus, within view of persons other than law enforcement. *See id*. at 1227 ("[t]he presence of other citizens during a police encounter is one factor suggesting its consensual nature."). SA Perry did not physically restrain or touch the Defendant until he placed her under arrest, having already observed the narcotics in a *G* brand suitcase that the Defendant was transporting but denied knowing anything about or caring about. SA Perry did not display his weapon to the Defendant. *See id.* (lack of touching or display of force tends to suggest the encounter was consensual). SA Perry was wearing plain clothes and not a uniform. SA Perry's behavior was pleasant, conversational and respectful and in no way coercive. SA Perry spoke to the Defendant in a consistently polite tone of voice. SA Perry did not retain any of the Defendant's personal effects for more than the few seconds necessary to examine them with Defendant's consent. Moreover, SA Perry did not obstruct the Defendant's movements within the bus. *See Drayton*, 536 U.S. at 204 (noting the fact that the officers had not blocked the defendant on the bus as a factor in favor of a consensual encounter).

14

The Defendant's consent was therefore valid and was not the fruit of coercion.  The aforementioned nature of the consensual encounter between SA Perry and the Defendant - the lack of force and the polite, conversational tone – also contribute to the conclusion that the Defendant gave valid consent.  Moreover, SA Perry did not use any trickery or deceit or make any false promises in requesting and obtaining consent from the Defendant.  His requests for permission to search were clearly defined, not confrontational, and straight forward.

The facts and circumstances of this case are similar to those engaged in the Supreme Court case of *Drayton*, which reiterated the proposition that police officers do not have to always inform citizens of their right to refuse a request for a consent search.  *Drayton*,  536 U.S. at 204 (citations omitted). Here, as in the case of *Drayton*, there was no application of force, no intimidating movement, no blocking of exits, no threat, no command, not even an authoritative tone of voice.  *Id*.

II.   SA Perry Did Not Unlawfully Search The Defendant's Suitcase Nor Did He Unlawfully Search An Abandoned Suitcase That The Defendant Transported

Simply put, the facts and circumstances of this case establish that SA Perry did not unlawfully search the Defendant's suitcase prior to his consensual encounter with the Defendant. And, as the Defendant consented to the searches, SA Perry did not require a search warrant to accomplish the searches of the Defendant's purse, pillow, backpack and suitcase.  *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).   (These searches of the Defendant's purse, pillow, backpack and suitcase did not recover any contraband substances.)

SA Perry did recover, by search, wrapped bundles of methamphetamine concealed in a suitcase being transported by the Defendant.  The Defendant effectively consented to the search of this suitcase as she initially denied any relationship to the suitcase, denied knowing about it and told SA Perry that she didn't care about it. If a person abandons property or denies knowing

15

about or owning luggage, then the property or luggage is considered abandoned and a person cannot then prevail in contesting that property's or that luggage's search and seizure.  *Abel v. United* States, 362 U.S. 217 (1960); *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004) (no legitimate expectation of privacy in overhead bag after defendant disclaimed ownership of any bags in overhead compartment); *United States v. Washington,* 677 F.2d 394,396 (4th Cir. 1982) (denying knowledge of or ownership of luggage constitutes abandonment); *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982).

     II.     The Search of The Defendant's Suitcase Was Within The Scope of Consent

The Defendant did not limit the breadth of her consent to search her suitcase in any manner.  The Defendant did not give any limiting conditions to the search of her items in the consent that she gave SA Perry for the search of those items.   It was, therefore, reasonable for SA Perry and within the scope of the consent to search all of the contents within Defendant's purse, pillow, backpack and suitcase.  Since the Defendant disclaimed any interest in a *G* brand suitcase (and no other passenger claimed any interest in the suitcase and the suitcase was identified to a fictional passenger traveling on the Defendant's reservation), it was also reasonable for him to search the abandoned *G* brand suitcase that contained the seized methamphetamine.

     IV.  Voluntariness of The Defendant's Statement To SA Perry

"The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." *United States v. Carrizales–Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006). Coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process clause. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "A determination of

voluntariness is based on the totality of the circumstances." *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998) (citations omitted). Relevant factors in determining voluntariness include: (1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment. *Carrizales–Toledo*, 454 F.3d at 1153. "The Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (*citing Missouri v. Seibert*, 542 U.S. 600, 608 n. 1 [2004]). "'No single factor is determinative.'" *Lopez*, 437 F.3d at 1063 (quoting *United States v. Lugo*, 170 F.3d 996, 1004 [10th Cir. 1999]).

In the context of allegedly deceptive statements, the Fourth Circuit examines the statement to determine if it is "so manipulative or coercive that [it] deprived [the Defendant] of his ability to make an unconstrained, autonomous decision to waive his rights." United States v. Walton, 10 F.3d 1024, 1030 (4th Cir. 1993).

A review of the facts and circumstances of this case establishes that Defendant's encounters with law enforcement on March 10, 2016, were consensual and the statement that she made during her post-arrest statement interview with SA Perry was made voluntarily.  At the Albuquerque DEA ADO office, in a non-descript interview room that was equipped with audio and visual recording technology, SA Perry began his recorded, custodial interview of approximately 44:04 minutes with the 33 year old, non-handcuffed Defendant by informing her of her rights pursuant to *Miranda*.  In the course of the *Miranda* colloquy with the Defendant, she asked SA Perry "If I answer questions now, then if I answer questions with a lawyer here how long would that be?"  SA Perry responded by saying "I really don't understand what you're

asking."  And the Defendant then replied "How long will it be to answer questions with a lawyer here?"

SA Perry then stated that if she wanted a lawyer then he would cease asking her questions until a lawyer was secured for her.  Then SA Perry reviewed the *Miranda* rights again with the Defendant to which she replied that she was ready to answer questions, executed the *Miranda* waiver and commenced to interview with SA Perry.  In order for a defendant to invoke her right to counsel pursuant to *Miranda,* the invocation must prove to be unambiguous and clear.  *Davis v. United States*, 512 U.S. 452, 458-59 (1994).  In *Davis,* the Court held that a defendant's statement "Maybe I should talk to a lawyer," was ambiguous and did not clearly invoke a right to counsel and that questioning of the defendant could successfully proceed.  *See e.g., United States v. Bezanson-Perkins*, 390 F.3d 34, 36, 40 (1st Cir. 2004) (no clear invocation of right to counsel when defendant said, "So if I requested a lawyer, there would be one that would come right now?")

As the Defendant did not invoke her right to counsel, her interview with SA Perry proceeded accordingly.  The Defendant was informed of her rights, voluntarily waived those rights (memorialized by the interview's recording) and continued to talk voluntarily with SA Perry about her relationship to the transport of the aforementioned narcotics.

It is apparent from her encounters with SA Perry, that the 33 year old Defendant who was able to travel independently from Kentucky to California by passenger airline and from California to New Mexico by bus, possessed a likeable personality and a real-life intelligence and education – an intelligence acumen that was able to anticipate questions and effectively synthesize thought.  The length and duration of her detention and interview that afternoon with SA Perry were not unduly prolonged (approximately 44:04 minutes), the interview was less

confrontational than it was conversational even though it hit an unexpected emotional moment near its conclusion when mention of her son arose.  SA Perry did not threaten the Defendant nor did he subject her with physical punishment. In other words, SA Perry did not physically or psychologically overbear the Defendant's will by coercion or manipulation and she was plainly able to make an independent decision, uninfluenced by any impairing substance, to waive her *Miranda* rights.

A review of the recording of the Defendant's interview shows that the Defendant is able to describe events and articulate her thoughts and feelings.  While the Defendant was periodically distraught (especially regarding her son) over the situation that she had gotten herself into, she was relatively calm, sometimes smiling, sometimes self-critical, responsive and able to answer questions. She understood the questions that were being asked of her and she gave intelligent, descriptive answers to those questions.

An analysis of whether a statement is voluntarily given focuses on a consideration of the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation. This inquiry looks toward the conduct of police or their agents as to whether they created pressure and, if so, the Defendant's capacity to resist that pressure. *See e.g., Mincey v. Arizona*, 437 U.S. 385, 399-40 (1978) (confession held involuntary because police continued interrogation of hospitalized suspect); *see also Davis v. North Carolina*, 384 U.S. 737, 752 (1966) (confession involuntary because police repeatedly interrogated a jailed suspect held incommunicado for 16 days); *but see United States v. Morris*, 287 F.3d 985, 988-89 (10th Cir. 2002) (statement voluntary though police interrogated Defendant in hospital while on pain medication because ten days had passed between crime and interrogation, and agent told Defendant to focus on his recovery); *United States v. Van Metre*, 150 F.3d 339, 348 (4th Cir.

19

1998) (confession voluntary despite 55-hour delay between arrest and arraignment because Defendant was not harmed, threatened, held in seclusion, or deprived of food and rest); *United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. N.Y. 1991)(The fact that the questioning took place in close quarters is not significant in determining whether Anderson's statements were voluntary); *People v. Zimmer*, 329 N.Y.S.2d 17-24 (1972) (German born defendant was questioned through a polygraph exam concerning the death of her adopted infant daughter. Her statement was suppressed because she was under "gross emotional stress" and had also been in police custody for more than three hours); *U. S. ex rel. Monks v. Warden, New Jersey State Prison at Rahway*, 339 F. Supp. 30 (D.N.J. 1972) (statement suppressed when 15-year old juvenile was in custody for eight days, isolated from his mother, had undergone some six hours of intermittent relay interrogation, which involved being put on a polygraph machine nine times, before he relented and confessed during the course of a homicide investigation); *Smallwood v. Warden, Maryland Penitentiary*, 367 F.2d 945, 947-949 (4th Cir. 1966)(Confession suppressed when a 23-year-old farm laborer with fifth grade education and low mental capacity was interrogated for four hours on one afternoon, for six hours during following forenoon and afternoon, and, after automobile trip taken and was questioned again until 4 or 5 a.m.).

In the context of the representative cases described above, an evaluation of the totality of circumstances embraced by this case is consistent with the conclusion that the Defendant gave a voluntary statement to SA Perry on March 10, 2016.  The Defendant, properly advised of her rights, waived those rights, voluntarily engaged her interview with SA Perry, independently participated in the interview which was not unnaturally prolonged and gave coherent, intelligent, freely-given descriptive answers that were not developed from coercive questioning or compromised by any impairing substance.

## CONCLUSION

For the reasons and the authorities cited and described above, upon review of the totality of the circumstances in the context of this case, it is evident that all of Defendant's encounters with law enforcement and the subsequent searches and seizures were consensual and that the Defendant's statement made during her post-arrest interview was voluntarily made.

Therefore, the United States respectfully requests that this Honorable Court deny the Defendant's motion to suppress the evidence seized and the statement given by the Defendant in this case.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

Electronically filed 06/02/2016
PAUL H. SPIERS
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico  87103
(505) 346-7274

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system which will send
notification to defense counsel.

Electronically filed June 2, 2016,
PAUL H. SPIERS
Assistant United States Attorney