UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  1:16-MJ-0931-KK |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| OLLISHA NICOLE EASLEY, | ) | Monday, March 14, 2016 |
| | ) | (11:06 a.m. to 11:41 a.m.) |
| Defendant. | ) | |


PRELIMINARY EXAMINATION  / DETENTION HEARING


BEFORE THE HONORABLE KIRTAN KHALSA,
UNITED STATES MAGISTRATE JUDGE




Appearances:              See Next Page

Court Reporter:           Recorded; Liberty - Gila

Clerk:                    C. Lopez

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**


Plaintiff:                  JONATHEN GERSON, ESQ.
                            U.S. Attorney's Office
                            District of New Mexico
                            P.O. Box 607
                            Albuquerque, NM 87103

Defendant:                  BRIAN A. PORI, ESQ.
                            Office of the Federal Public Defender
                            First State Bank Building
                            111 Lomas Boulevard NW
                            Suite 501
                            Albuquerque, NM 87102

U.S. Probation/Pretrial: Anthony Galaz

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GERALD PERRY | 5 | 6 | | |

RULING

| RE PROBABLE CAUSE | 30 |
|---|---|

ARGUMENT

| BY MR. PORI | 31 |
|---|---|

RULING

| RE DETENTION | DEFERRED |
|---|---|

4

1      **Albuquerque, New Mexico; Monday, March 14, 2016; 11:06 a.m.**

2                  **Call to Order**

3         **THE CLERK:**  The *United States of America versus*

4  *Ollisha Nicole Easley.*

5         **MR. GERSON:**  The United States by Jonathen Gerson.

6         **MR. PORI:**  Good morning, your Honor, Brian Pori for

7  Ollisha Nicole Easley who appears before you from in custody.

8  We are prepared to go forward both with the Preliminary Hearing

9  and the Detention Hearing, and we'd like to consolidate those

10  proceedings by way of questioning of Special Agent Jay Perry.

11         **THE COURT:**  All right.  Good morning, ma'am.

12         The Government is ready with their witness?

13         **MR. GERSON:**  Yes, your Honor.  Would your Honor

14  permit us to proceed by asking Agent Perry if he adopts the

15  affidavit in support of the Complaint as his Direct testimony

16  and then make him available through Cross examination?

17         **MR. PORI:**  I have no objection to that proceeding.

18         **THE COURT:**  That is fine with me.

19         **MR. GERSON:**  Okay.  Agent Perry.

20         **THE CLERK:**  Would you raise your right hand?

21         **GERALD PERRY, GOVERNMENT'S WITNESS, SWORN**

22         **THE WITNESS:**  Yes, ma'am, I do.

23         **THE CLERK:**  Would you please spell your last name for

24  the record?

25         **THE WITNESS:**  My name is Gerald Perry, last name

Perry - Direct / By Mr. Gerson                              5

1    P-E-R-R-Y.

2              **MR. GERSON:**  And if I may, your Honor, I'll just ask

3    the witness if he adopts that or if he does not.

4              **THE COURT:**  Okay.

5                            **DIRECT EXAMINATION**

6    **BY MR. GERSON:**

7    Q    Agent Perry, have you had occasion to review that

8    Affidavit in support of your arrest warrants in this case?

9    A    In the Criminal Complaint, yes, sir.

10   Q    And do you adopt the content of your Affidavit in the

11   Criminal Complaint as your Direct testimony for this hearing

12   today?

13   A    Yes, sir, I do.

14   Q    Is there any change, as you sit here right now, that you'd

15   like to make to that Affidavit before Mr. Pori has asked you

16   any questions?

17   A    No, sir.

18             **MR. GERSON:**  Okay, thanks very much.

19             **THE COURT:**  All right.

20             **MR. PORI:**  May I please go ahead?

21             **THE COURT:**  Yeah.

22             **MR. PORI:**  Thank you.

23   //

24   //

25   //

1                          **CROSS EXAMINATION**

2     **BY MR. PORI:**

3     Q     Agent Perry, good morning.

4     A     Good morning.

5     Q     On March 10th you received a telephone call from a --

6     presumably someone who works for the Greyhound Bus Lines that

7     was working in Clermont, California?

8     A     No, sir, that's not correct.

9     Q     How did you receive the information that's contained in

10    Paragraph 1 of the Criminal Complaint?

11    A     I don't know all of the information that's in Paragraph 1,

12    if I could look at it.

13    Q     Go ahead and look at your Complaint if that -- will that

14    refresh your recollection?

15    A     Yes, it would.

16    Q     Go ahead and take a look at it and when you've had an

17    opportunity to review it let me know.

18    A     Can you repeat your question again?

19    Q     So did you receive any information from anyone at the

20    Greyhound Bus Lines prior to March 10th, 2016?

21    A     I received information from a confidential source.

22    Q     Okay, and that confidential source told you that Ollisha

23    Easley and Denise Moore would be traveling from Clermont,

24    California to Louisville, Kentucky, correct?

25    A     No, I was not informed of that, no.

1   Q    Okay.  Was the confidential source paid?

2   A    No, they were not paid for this information, no.

3   Q    Okay.  And the information that you had showed that

4   Ollisha Easley and Denise Moore would be traveling from

5   Clermont, California to Louisville, Kentucky, correct?

6   A    That's what was on the Greyhound passenger list, yes.

7   Q    And you saw that they had paid for their trip in cash?

8   A    Yes, sir.

9   Q    How many other passengers on the Greyhound bus had paid

10  for their trip in cash?

11  A    I'm not exactly sure.

12  Q    More than 10?

13  A    I'm not exactly sure.

14  Q    Can you give us any estimate at all?

15  A    No, sir, I can't.

16  Q    No estimate whatsoever?  It could have been all of them,

17  it could have been only Ollisha, is that your testimony?

18  A    My testimony is I don't remember exactly how many people

19  paid cash.

20  Q    I understand that.  I'm trying to narrow it down if I can

21  and if you can.  Is it the only one was Ollisha, it could have

22  been all of them, anything in between, you just don't know?

23          MR. GERSON:  Your Honor, I think we covered this

24  sufficiently.

25          THE COURT:  Are you objecting?

Perry - Cross / By Mr. Pori                           8

1          **MR. GERSON:**  Yes, your Honor, I am objecting.

2          **THE COURT:**  Okay, and the basis for your objection

3    is?

4          **MR. GERSON:**  Asked and answered, badgering,

5    argumentative.

6          **THE COURT:**  Okay.  All right, I sustain the

7    objection.

8    **BY MR. PORI:**

9    Q    Do you know if Ollisha bought her ticket the day before

10   she traveled?

11   A    I'm not exactly sure of the day she bought it.

12   Q    Okay, it could have been the day before?

13   A    It could have been, I'm not exactly sure.

14   Q    If -- so on March 10th you were at the Greyhound Bus

15   station when the eastbound bus arrived in Albuquerque for its

16   cleaning and refueling stop, correct?

17   A    Yes, sir, I was.

18   Q    And you met the bus?

19   A    I'm not exactly sure if I was there when it actually

20   arrived or not, I can't remember.

21   Q    In Paragraph 3 of your Criminal -- or of your Affidavit

22   you said that you observed the luggage that was underneath of

23   the bus as checked luggage, correct?

24   A    Yes, sir.

25   Q    What did you do to observe it?

Perry - Cross / By Mr. Pori                          9

1   A    I looked at it, looked at the tags.

2   Q    And you're very familiar -- where did you look at it?

3   A    I looked at it actually on numerous occasions.  I looked

4   at it inside of the wash bay, and then after the bus had pulled

5   up to the -- where the passengers re-board, I observed the

6   luggage underneath the bus again.

7   Q    You're familiar with the policies and procedures of the

8   Greyhound Bus Line with respect to searching a passenger's bags

9   while they're passengers on Greyhound Buses, correct?

10  A    With Greyhound's policy?

11  Q    Yes, sir.

12  A    I'm not exactly sure of every detail of their policy, but

13  I know somewhat about their policy.

14  Q    You know, for example, that if an employee of Greyhound is

15  going to search a passenger's luggage, the passenger has to be

16  present while that search occurs, correct?

17  A    That's what I've been told, but I don't know if that's

18  their actual policy.

19  Q    Okay.  But in the wash bay, no Greyhound baggage handler

20  actually handles the luggage in the wash bay, correct?

21  A    No, to my knowledge, no.

22  Q    But you do?

23  A    Yes, sir, I do.

24  Q    You did on this occasion?

25  A    Yes, sir.

Perry - Cross / By Mr. Pori                               10

1  Q    And that involves opening the doors of each of the luggage

2  bays, correct?

3  A    Yes, sir, it does.

4  Q    It involves going through each individual luggage to try

5  to look at the tags and things like that, is that correct?

6  A    Well, that depends on what you mean by "things like that,"

7  but, yes, it does involve looking at the tags.

8  Q    Well, let's just -- I don't mean to -- let's talk about

9  this case.  Tell me what you did to observe the luggage in the

10 wash bay.

11 A    I opened up the luggage bins, as you stated, looked at the

12 luggage.  Had to move some of the luggage to get to all of the

13 luggage.  Looked at the tags.  That's basically what I did.

14 Q    Okay.  Did you remove Ms. Easley's luggage?

15 A    Eventually I removed it, yes.

16 Q    When you were in the wash bay did you remove it?

17 A    No, I don't think I removed it from underneath the bus,

18 no.

19 Q    Okay.  You said you "don't think."  How certain are you

20 that you did not?

21 A    I don't remember removing it from the bus.

22 Q    And Ms. Moore's luggage, did you remove it -- in the wash

23 bay, excuse me?

24 A    I don't remember moving her luggage from the bus --

25 Q    Was Special Agent Gotea (phonetic) with you when the --

1   when you were observing the luggage in the manner that you

2   described at the wash bay?

3   A    Yes, sir, he was.

4   Q    And you're familiar with the cameras, the surveillance

5   cameras that are there in the wash bay, correct?

6   A    Yes, sir, I am.

7   Q    Do you know if Agent Gotea obscured any part of you from

8   the surveillance camera while you were observing the luggage

9   under the wash bay?

10  A    I'm not sure exactly where --

11  Q    Okay.

12  A    -- Agent Gotea was at all times so I can't say yes or no

13  to that question.

14  Q    So what -- tell me everything that you recall.  How did

15  you observe the gray-colored Rome Essential brand suitcase with

16  the luggage check tag in the name of Ollisha Easley, tell me

17  exactly how you observed it and where it was.

18          Well, we'll maybe start with that.  Where was the

19  Rome Essential brand suitcase when you observed it in the wash

20  bay?

21  A    It was in the -- underneath the bus in the third luggage

22  bin from the front, so basically the back one.

23  Q    Okay.

24  A    It was lying inside with the other luggage.

25  Q    Okay, and where was the black-tan colored G brand suitcase

1   with the luggage tag in the name of --

2   A    The same location.

3   Q    Okay, in the third wash bay amongst all of the other

4   luggage?

5   A    Well, I don't know how -- you said "third wash bay."

6   Q    I'm sorry, third cargo hold.

7   A    Yes, sir.

8   Q    And when we count third cargo hold we'd be talking about

9   the first cargo hold is the cargo hold closest to the bus

10  driver on the bus, is that correct?

11  A    Yes, sir, that's correct.

12  Q    And the third cargo bay would be the last cargo bay of the

13  bus, is that correct?

14  A    Yes, sir.

15  Q    All right.  So after you observed this luggage you decided

16  to approach Ms. Easley, correct?

17  A    No, I decided to get on the bus and speak with all of the

18  passengers as we normally do.

19  Q    During these observations what other passengers did you

20  want to speak to?

21  A    All of the passengers that were on the bus as we do in a

22  normal -- a normal day, that's what we attempt to do.

23  Q    So what was it about your observation that was noteworthy

24  that you would include in this Criminal Complaint the

25  observation of Ms. Easley's luggage in the wash bay?

1    A    Because she was one of the pieces of luggage that I

2    observed.

3    Q    Okay.  What are the names of the other people whose

4    luggage you observed there in the wash bay?

5    A    I don't have the passenger list with me.  If I did I would

6    give it to you.

7    Q    So are you saying that there was nothing suspicious about

8    this luggage at the time you observed it in the wash bay?

9    A    I wasn't finished answering the last question.

10   Q    I'm sorry, go ahead.

11   A    If I had that list I'd be able to tell you the other

12   names, but I don't know the other names.

13   Q    Okay.  But was there anything suspicious about Ms.

14   Easley's luggage that you observed when it was in the wash bay?

15   A    No, sir.

16   Q    Was there anything suspicious about any of the luggage you

17   observed when it was in the wash bay?

18   A    No, sir.

19   Q    And how many -- you boarded the bus and you spoke with Ms.

20   Easley, correct?

21   A    Yes, I did.

22   Q    How many people did you speak with before you spoke with

23   Ms. Easley?

24   A    I don't know exactly, probably three-fourths of the bus.

25   Q    Okay, and you tape record these encounters, correct?

Perry - Cross / By Mr. Pori                                    14

1   A     Yes, sir, I do.

2   Q     And there is a tape of this encounter, correct?

3   A     Yes, there is.

4   Q     All right.  Did you review that tape in preparing this

5   Criminal Complaint?

6   A     No, sir, I did not.

7   Q     So the Criminal Complaint was prepared from memory?

8   A     Yes, sir, it was.

9   Q     Okay.  And I noted that you -- it might be hard to

10  remember all of these details, but when you first approached

11  Ms. Easley did you ask for her ticket and her identification?

12  A     I asked for her ticket.  I can't remember if I asked for

13  her identification, I believe I did, but I can't really

14  remember about the identification.

15  Q     Can you give us a rough estimate of how many people you

16  spoke with on the bus that day?

17  A     To my knowledge I spoke with each passenger, each and

18  every passenger that was on the bus that day.

19  Q     And how many people would that be?

20  A     The bus was pretty full, I can give you an estimate, I

21  don't know if I could --

22  Q     That would be fine.

23  A     It holds 51 or 55 passengers depending on the size of the

24  bus, maybe 35, 40, that's an estimate.

25  Q     And that was -- you think that there were -- approximately

Perry - Cross / By Mr. Pori                    15

1   35 people on the bus that day?

2   A    Well, 35 to 40 people, yes.

3   Q    Okay, and you spoke with all 35 or 40 of the people?

4   A    I -- to my knowledge I spoke with each passenger that was

5   on the bus, yes, sir.

6   Q    Do you know if Agent Gotea spoke with any of the

7   passengers?

8   A    He didn't speak with any passengers.

9   Q    Why not?

10  A    Because the person that generally works with me was on

11  vacation and I needed somebody to be with me, and Agent Gotea

12  doesn't work at the bus station, it's actually probably the

13  first or second time maybe he had been there, he doesn't do --

14  he doesn't do this type of work so he's basically there just to

15  cover me and to be my -- for officer safety issues.

16  Q    Of all of the people that you spoke with, however many

17  people that may be, do you remember asking anyone else for both

18  their ticket and their identification?

19  A    I don't recall.

20  Q    Could you have?

21  A    It's possible, yes.

22  Q    Is it likely?

23  A    I don't -- I don't know if I did or not, I can't remember.

24  Q    Well, it's something that sticks out to me.  Does it stick

25  out to you that you -- I know I've heard these tapes say "Hey,

1    where you going?  How long you going to be there?"  People

2    could get real chatty, but it's not often that -- it seems to

3    me, and you correct me if I'm wrong, it's not often that you

4    say "I need your ID and I need your ticket."  Is that unusual

5    when you do these consensual encounters on the bus?

6    A    Well, you went through a bunch of questions there, I don't

7    know which one you want me to answer.

8    Q    Whichever one you feel like answering.

9    A    Sometimes I ask for IDs, sometimes I ask for tickets,

10   sometimes I don't.  I don't recall on this date how many IDs or

11   how many tickets I asked for.

12   Q    I heard you when you say that, but my question was in your

13   experience is it unusual when you ask a passenger for both

14   their ticket and their ID?

15   A    I wouldn't say that's unusual, no.

16   Q    You don't remember -- you don't have an independent

17   recollection now of asking for anyone else's ticket and ID

18   besides Ms. Easley, correct?

19   A    I don't remember how many if I did or not, I don't

20   remember that.

21   Q    Okay.  Nothing about her race that made you ask for both

22   her ticket and her ID was there?

23   A    Nothing about her what?

24   Q    Race?

25   A    No, it had no factor in what I do on that bus or any other

Perry - Cross / By Mr. Pori                              17

1   bus.

2   Q    Okay.  Where there other African-Americans on the bus that

3   day?

4   A    I believe there were, yes.

5   Q    Okay.  When you met Ms. Easley you asked for her ticket,

6   her ID, you asked for consent to search her belongings,

7   correct?

8   A    I wouldn't say that's correct because you asked me earlier

9   if I asked her for her identification and I don't remember if I

10  did or not.

11  Q    You asked if she had any luggage with her on the bus,

12  correct?

13  A    Yes, sir, I did.

14  Q    And she identified the backpack and the pillows, correct?

15  A    Yes, sir, she did.

16  Q    And she had -- she told you she had one checked in

17  suitcase, correct?

18  A    Yes, she did.

19  Q    And you asked for permission to search her backpacks and

20  the pillows, correct?

21  A    Yes, sir.

22  Q    And you did and found nothing, correct?  She consented,

23  you searched them and you found nothing in the backpack or the

24  pillows, correct?

25  A    Well, there was clothing and stuff in the backpack, I

Perry - Cross / By Mr. Pori                          18

1   wouldn't consider that nothing.

2   Q    I'm sorry, you found nothing illegal in either the

3   backpack or the pillows, correct?

4   A    Correct.

5   Q    And then you asked for permission to search her luggage

6   underneath, correct?

7   A    Yes, sir.

8   Q    Okay.  And then at some point you got off the bus, is that

9   correct?

10  A    Yes, sir, I did.

11  Q    And you pulled out Ms. Easley's suitcase, correct?

12  A    Yes, I did.

13  Q    And you also pulled out Ms. Moore's suitcase, correct?

14  A    Yes, sir, eventually I did.

15  Q    Okay.  When did -- how many times did you get off the bus

16  and get back on the bus before you finally arrested Ms. Easley,

17  if you know?

18  A    I don't know exactly.

19  Q    Could it have been as many as four times?

20  A    I don't know.

21  Q    It could have been as many as four times?

22  A    I don't know how many times I got on and off the bus.

23  Q    Why don't you know?  Why -- this is March, four days ago,

24  you have no idea whether it was one time or a thousand times,

25  or one time, help me out, Agent Perry.

1  A    I'm not here to help you and I don't --

2  Q    I understand that.

3  A    I don't know how many times I got on and off the bus.

4          **THE COURT:** Will you hold on one second?

5          **MR. PORI:** Sure.

6      **(Pause)**

7          **THE COURT:** Okay, go ahead.

8          **MR. PORI:** Thank you.

9  **BY MR. PORI:**

10 Q    Where was Ms. Easley when you searched her backpack?

11 A    She was sitting in her seat.

12 Q    Okay.  Did you search Ms. Easley's purse?

13 A    On the bus I'm not exactly sure if I did or not.

14 Q    That wasn't my question.  My question was did --

15 A    Yes, I obviously did.

16 Q    You don't know where she was when you searched her purse?

17 A    I know that I searched it when she was standing outside

18 the bus.

19 Q    Okay.  How did you ask Ms. Easley to get off the bus?

20 A    Just like you said, asked her if she could step off the

21 bus and speak with me.

22 Q    Okay, was that -- Now we'll break this down.  You asked

23 for permission to search her backpack and her pillow, and you

24 find no contraband and you get off the bus, is that correct?

25 A    I got off the bus to look at her luggage, yes.

1    Q    Okay, and then you got back on the bus to tell her to come

2    here, correct?

3    A    No, that's not correct.

4    Q    How did you get Ms. -- when you were off of the bus,

5    looking at her luggage, did you get back on the bus to speak to

6    Ms. Easley?

7    A    Yes, sir, I did.

8    Q    So that would be the second time that you got on the bus,

9    correct?

10   A    Well, when you say "get on the bus," I may have gotten on

11   the bus and spoken with the driver, I may have gotten on the

12   bus and got back off earlier.  I don't know how many times I

13   got on and off the bus, tell --

14   Q    All right.  Well, let's start, from the time you met Ms.

15   Easley, when you met Ms. Easley, you were on the bus, correct?

16   A    I was already on the bus when I spoke with her.

17   Q    And then you got off the bus to look at her luggage,

18   correct?

19   A    To search it, yes.

20   Q    And then you got back on the bus to talk to her, correct?

21   A    Yes, sir, I did.

22   Q    So for my purposes that would be at least the second time

23   that you got on the bus this day, correct?

24   A    Well, it was the second time, yes.

25   Q    So we know it's more than one, you remember now, you got

Perry - Cross / By Mr. Pori                    21

1   back on the bus more than one time, correct?

2   A    Yes.

3   Q    Are there any other times that you remember getting off

4   the bus and getting back on the bus between the time you met

5   Ms. Easley and the time you arrested her?

6   A    I believe I got back on the bus when she was placed under

7   arrest.

8   Q    Okay.  So Ms. Easley got off the bus and submitted to a

9   search of her purse, correct?

10  A    She did consent to that, yes.

11  Q    And then did she get back on the bus?

12  A    I believe she did, yes.

13  Q    And then what did you do after she -- you searched her

14  purse, then Ms. Easley got back on the bus.  What happened

15  next?

16  A    I re-boarded the bus and she was placed under arrest.

17  Q    Well, so she's off the bus.  You search her purse, you

18  don't find any contraband in her purse, correct?

19  A    No, I didn't find any contraband in her purse.

20  Q    And then she gets back on the bus, correct?

21  A    Yes, she did.

22  Q    And then you get on the bus to arrest her, correct?

23  A    Yes, sir.

24  Q    What happened between the time you searched her purse and

25  the time you got on the bus to arrest her?

1    A    I had searched the contents of the G-brand black and tan

2    colored suitcase.

3    Q    Okay, and that wasn't in Ms. Easley's name?

4    A    No, it was not.

5    Q    Okay.  And you don't know if the owner of that bag had

6    fled or had just not come back to the bus in time, you don't

7    know what happened to the owner of that bag, correct?

8    A    At that time I did not know.

9    Q    Okay.  Do you know now?

10    A    Based upon what Ms. Easley told me post-arrest, yes.

11    Q    Okay, and we'll get to that.  So how much time passed

12    between searching Ms. Easley's purse and her getting back on

13    the bus and you getting back on the bus to arrest Ms. Easley?

14    A    I'm not exactly sure.

15    Q    More than a minute?

16    A    I'm not exactly sure.

17    Q    It could have been a second?

18    A    I don't think it was a second, no.

19    Q    So between a second and infinity can you give me an

20    estimate of how much time it took?

21    A    I can't give you an estimate, I don't know.

22    Q    All right.  And at some point you arrested Ms. Easley,

23    correct?

24    A    Yes, sir.

25    Q    You placed her in handcuffs, correct?

1  A    Yes, sir.

2  Q    And you took her from the bus station to the DEA office

3  over there on the -- what's the name of that neighborhood?

4  Mesa Del Sol?

5  A    Yes, sir.

6  Q    All right.  And then you took her to the DEA office and

7  held her in the detention room there in the DEA office,

8  correct?

9  A    Yes, sir.

10 Q    And then at some point you spoke with her, correct?

11 A    Yes, sir.

12 Q    And do you remember saying to her "You need to be

13 selfish?"

14 A    Yes, I did tell her it was a time to be selfish.

15 Q    And tell me what -- from the time you made the statement

16 "You need to be selfish" tell me everything that you remember

17 saying until Ms. Easley waived her Miranda rights?

18 A    Can you repeat the question, please?

19 Q    From the time you said to Ms. Easley "You need to be

20 selfish" until the time that she waived her Miranda rights, can

21 you tell me everything that you said to her in that time

22 period?

23 A    Not everything because I processed her during that time

24 period which included fingerprints, photographs.  I'm sure I

25 told her to come out of the cell.  I don't know everything I

 1   told her when she moved around a lot as far as locations, so

 2   that was during processing, I don't know everything that I told

 3   her.

 4   Q    Was any part of that recorded?

 5   A    The part of the processing?

 6   Q    Yes, sir.

 7   A    No, sir.

 8   Q    All right.  So tell me everything you remember telling her

 9   between the time you said "You need to be selfish" and the time

10   she waived her Miranda rights.

11   A    I don't know each and everything that I told her.  I asked

12   her if she needed water.  I asked her if she wanted anything to

13   eat, she had food in her bag.  I asked her to step out of her

14   cell, we was going to process her.  I asked her to stand

15   against the wall while I photographed her.  I told her to sit

16   down on the bench.  I asked her various questions for our

17   personal property form which is name, date of birth, address,

18   family members, Social Security number, phone number, where she

19   was born.

20   Q    Let me ask you this, Agent Perry, did you tell her that

21   she needs to think about her kids?

22   A    Yeah, I told her she needed to take her kids into

23   consideration.

24   Q    Did you tell her the people who gave her that -- those

25   drugs in Denise's suitcase didn't give an "F" about her?

Perry - Cross / By Mr. Pori                    25

```
1   A    I don't know if that's the exact word that I used, no.
2   Q    Tell me, do you know the sentiment I'm implying?  Did you
3   say anything like that?  Tell me the words you used, "These
4   MFers don't give an F about you," something like that?
5   A    No, I don't believe I used any of those words.
6   Q    Okay.  Tell me what you do remember about these people
7   don't have your best interests at heart, did you convey that
8   impression to her at some point?
9   A    Yeah, but it was not that way, it was totally different
10  than the way you said it.
11  Q    Oh, fine, okay, I'm sorry.  Tell me what you said.
12  A    I don't remember the exact point, but it was told to her
13  that people, they don't really care, they don't care about her.
14  Q    Okay, so you did convey to her these people don't care
15  about you?
16  A    Yes.
17  Q    And you need to help yourself?
18  A    I don't believe I ever told her she needed to help
19  herself, I told her she needs -- this is the time in her life
20  if -- I told her I didn't know if she was a selfish person or
21  not --
22  Q    Uh-huh (yes.)
23  A    -- and if she wasn't this is the time in her life that she
24  needed to be selfish and think about it.
25  Q    Did she ever ask you at any point before she waived her
```

Perry - Cross / By Mr. Pori                          26

1    Miranda rights, "What am I going to get out of it?"

2    A      Before?

3    Q      Yes, sir.

4    A      I don't recall.

5    Q      She may have?

6    A      I don't recall.

7    Q      And it's very important that we clear this up.  There's

8    two things I don't recall, "I don't recall" means, either one,

9    she may have said it and I don't recall; or, two, I do recall

10   that she did not say that.  Which of those is it?

11   A      I don't recall if she said it or not.

12   Q      All right.  But not "I don't recall that she did not say

13   that?"  You cannot affirmatively say that she did not say "What

14   do I get out of it?"

15          **MR. GERSON:**  I object, I don't understand the

16   question.  I'm sure he's much more clever than I, but I would

17   ask him -- I don't think we need an answer to this question.

18          **MR. PORI:**  I'm going to move on.  Please let me

19   rephrase.  I'm going to move on.

20   **BY MR. PORI:**

21   Q      Did you ever tell her, before she waived her Miranda

22   rights, "If you want me to help you I can go in front of the

23   Judge and tell him or her you were helpful?"

24   A      No, I never told her if she wanted me to help her -- no, I

25   don't --

Perry - Cross / By Mr. Pori                                27

1   Q    Did you make -- did you suggest anything like that?

2   A    I don't remember saying that, no.

3   Q    Oh, I know you don't remember saying that.  That wasn't my

4   question, my question was did you convey a sentiment like that

5   in any way?

6   A    I don't recall saying that statement or anything like

7   that, no.

8   Q    And, again, there's two "I don't recalls," one, I don't

9   recall if I may have said it, or two, I do not recall making

10  that statement.

11  A    I don't remember making that statement.

12  Q    All right, thank you.  All of this conversation was before

13  you took her into an interview room where there was a tape

14  recorded statement made, correct?

15  A    When you say "all of this conversation," I don't what-all

16  conversation you're referring to.

17  Q    I'm sorry.  Let's see if we can be clear at the same time.

18  There was a time when you said to Ms. Easley, "You need to be

19  selfish," is that correct?

20  A    As I testified earlier I'll stick with the statement I

21  testified to earlier is what I said.

22  Q    Okay, and then there was a time when she waived her

23  Miranda rights, correct?

24  A    Yes, sir.

25  Q    Now we're talking about the time between those two events,

1  do you have that time in mind?  The time between "you need to

2  be selfish" and the time that she waived her Miranda rights, do

3  you have that time in mind?

4  A    This is during processing as I've testified to earlier.

5  Q    Okay, is that how we should describe that time period as

6  during processing, is that the easiest way to describe it?

7  A    That's what actually occurred.

8  Q    Okay, is that the easiest way to describe it for you?

9  A    That's what occurred, so, yes.

10 Q    I understand.  Is that the easiest way to describe it for

11 you?

12         **THE COURT:**  He said "yes."

13         **MR. GERSON:**  Objection, asked and answered

14 repeatedly.

15 **BY MR. PORI:**

16 Q    During processing was the conversation that you had with

17 Ms. Easley recorded?

18 A    Not during processing.  I believe I answered that earlier.

19 Q    I believe you did, too.

20         And when you took the Miranda rights, a waiver, was

21 that recorded?

22 A    Yes, sir, it was.

23 Q    Where did that happen?

24 A    It was audio and video recorded at the DEA office in the

25 interview room right besides the processing area.

1  Q    So we talked about the processing time that wasn't

2  recorded, and we talked about "you need to be selfish," "you

3  need to think about your kids," "these people don't care about

4  you."

5            Do you remember anything else you said to her aside

6  from completing forms and get out of the cell and do you want

7  water?  Anything like "You can either help yourself or hurt

8  yourself," anything along those lines?

9  A    I don't remember all of that conversation, no.

10 Q    Okay, and in the -- you took her to a room where she made

11 the Mirandized statement that was recorded, correct?

12 A    Yes, sir.

13 Q    And during that statement did she tell you that she was

14 transporting narcotics?

15 A    Yes, she did.

16 Q    And did she tell you she didn't know what kind of

17 narcotics she was transporting?

18 A    Yes, she did make that statement, too.

19 Q    And did you field test these narcotics?

20 A    Yes, sir, I did.

21 Q    And you think they're methamphetamine?

22 A    The field test kit revealed that it was methamphetamine.

23 Q    Well, you and I have a case where it field tested for

24 methamphetamine and it turned out to be Fentanyl, correct?

25 A    Yes, that's correct.

1  Q    Do we know if we're dealing with Fentanyl?

2  A    I don't believe it's Fentanyl.

3  Q    Are we dealing with steroids?

4  A    I believe it's methamphetamine.

5          **MR. PORI:**  Your Honor, may I have a moment?

6       **(Pause)**

7          **MR. PORI:**  I have nothing further, thank you.

8          **THE COURT:**  Okay.  Any Redirect?

9          **MR. GERSON:**  No, your Honor.

10         **THE COURT:**  All right, Agent Perry, you may step

11 down.

12         **THE WITNESS:**  Thank you.

13      **(Witness excused)**

14         **MR. PORI:**  Your Honor, we're prepared to submit with

15 respect to the matter of Probable Cause and we are asking to be

16 heard on Detention.

17         **THE COURT:**  Okay.  Does the Government want to make

18 any statements or are you prepared to submit as well?

19         **MR. GERSON:**  We're prepared to submit, your Honor.

20         **THE COURT:**  Okay.  All right, based on the proffer

21 and the testimony of Agent Perry I find that there's Probable

22 Cause to believe that Ms. Easley committed the crime of

23 possession of over 500 grams of a mixture and substance

24 containing a detectable amount of methamphetamine with intent

25 to distribute.

1          Now as to detention --

2          **MR. PORI:**  Your Honor, we have no objection to the

3    Court taking judicial notice of the Pretrial Services Report.

4    We admit that the presumption applies.  We know the

5    recommendation is for detention, we understand she has a prior

6    conviction for robbery.  The only thing notable about that is

7    that she was given straight probation on that.  That matter is

8    still pending, a probation violation, so it's not a regular

9    robbery.

10         I would ask the Court to consider releasing Ms.

11   Easley to the custody of the La Pasada Halfway House.  I think

12   that she -- and even released on an electronic monitor so that

13   would reduce the risk of flight.  I think that this is an

14   individual who could benefit from the counseling treatment and

15   testing provided by both the Pretrial Services office and the

16   folks at La Pasada.  I think that release to La Pasada will

17   protect the public.  I don't anticipate that there would be any

18   risk of danger to anyone in the public.

19         I think the real issue here, I think, through, you

20   know, the Government, although the presumption applies I think

21   if we come forward with evidence enough to rebut the

22   presumption, which I think is apparent, that she confessed, she

23   was honest, she was cooperative.  She didn't resist, she didn't

24   fight, she didn't -- she told the agent what she knew,

25   presumably without any kind of incentive, although that may be

1    disputed further on down the road.

2          But I think the fact that she was forthright, that

3    she -- he doesn't recall that she said "I didn't even know what

4    kind of drugs I was carrying," but the Complaint speaks for

5    itself.  She was to be paid $1,000.  She is, clearly, a minor

6    player in an ongoing conspiracy that we see signs of every day.

7    She is not a violent person and I think that her coming forward

8    with evidence is sufficient to rebut the presumption and put

9    the presumption back on the Prosecution to prove by clear and

10   convincing evidence that she's a danger.  I don't think they

11   can meet that burden here.

12         And then to prove by a preponderance of the evidence

13   that she's a flight risk, and I think even if she is a flight

14   risk, the Court is obligated to fashion the least restrictive

15   conditions designed to address that risk and release her to La

16   Pasada Halfway House on an ankle bracelet, I respectfully

17   submit, would solve that problem.

18         **THE COURT:**  Well, one of the things I'm concerned

19   about is that I really am operating with limited information

20   with regard to making the assessment of all of the 3142 factors

21   because Ms. Easley didn't submit any information for an

22   interview, so I don't know how long she has resided in

23   Kentucky.  I don't know, you alluded to the fact that she has

24   children, I don't know anything about her children, I don't

25   know about her travel to other places, I don't know any of the

1   information about her circumstances to make a full evaluation

2   of all of those factors.

3          **MR. PORI:**  I'm sorry about that.  I should have read

4   the report more carefully and I'm sorry to waste your time for

5   that.  Then what I would ask is that we set this matter over to

6   Wednesday when I'll be back here in Court, ask Pretrial

7   Services to interview her in my presence and we'll get you all

8   of that information.

9          **THE COURT:**  Okay.  All right.  Any objection to

10  continuing this --

11         **MR. GERSON:**  No, your Honor.

12         **THE COURT:**  -- detention hearing?

13         All right, Ms. Easley, because the Pretrial Services

14  Report doesn't contain enough information for me to consider

15  all of the factors that are -- that I'm required to consider

16  under the statute for determining whether there are conditions

17  of release that can be fashioned, your Counsel has requested a

18  continuance of the Detention Hearing between now and Wednesday.

19  Pretrial Services will interview you with your attorney present

20  and any questions that he doesn't object to you providing

21  answers to will be put into this report so that I can consider

22  all of the factors including your history, your circumstances,

23  your time at your present address in Kentucky and all of that,

24  in making a determine about whether there are conditions under

25  which you can be released pending trial in your case, okay?

34

1          **THE DEFENDANT:**  Yes, your Honor.

2          **THE COURT:**  Do you have any objection to me

3   continuing the hearing till Wednesday?

4          **THE DEFENDANT:**  No, your Honor.

5          **THE COURT:**  All right.  You are going to be remanded

6   to the custody of the Marshals Service pending your Detention

7   Hearing on Wednesday.  Thank you.

8          **MR. PORI:**  Thank you, your Honor.  May we be excused?

9          **THE COURT:**  Yes.

10          **MR. PORI:**  Thank you, Judge.

11        **(This proceeding was adjourned at 11:41 a.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                    _June 17, 2016_


                    TONI HUDSON, TRANSCRIBER