# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                      Crim. No. 16-1089-MV

OLLISHA NICOLE EASLEY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Ollisha Nicole Easley's Motion to Suppress. [Doc. 20]. Having reviewed the Motion, briefs, testimony, and relevant law, for the reasons below, the Court grants the Motion.

## BACKGROUND

This Motion concerns a warrantless bus sweep and its fallout—one of many warrantless sweeps that have come before this Court and courts across the country. On March 10, 2016, Ollisha Easley, the defendant, was a passenger on a Greyhound bus traveling east from Claremont, California. The bus made many scheduled stops at stations along its route. Some stops were for a few minutes. The bus stopped for a longer layover at the bus station in Albuquerque, New Mexico. When it is on schedule, the bus arrives in Albuquerque at 9:55 a.m. and departs at 11:15 a.m.[1]

During the one-hour-and-twenty-minute layover in Albuquerque, passengers disembarked. Those who were continuing on to eastward destinations waited in the terminal

---

[1] DEA Special Agent Jarrell Perry testified at the suppression hearing that Ms. Easley was traveling on a bus that arrives in Albuquerque at 9:55 a.m. and departs at 11:15 a.m. According to the corresponding bus itinerary on the Greyhound website, the bus would have departed from Claremont at 2:50 p.m. the day before it arrived in Albuquerque and would have made stops in Riverside, San Bernardino, and Blythe, California, Phoenix and Flagstaff, Arizona, and Gallup, New Mexico, before stopping in Albuquerque.

1

while the bus was serviced, refueled, and cleaned in the maintenance shop—what is called the wash bay, south of the terminal. When the bus was ready to depart from Albuquerque, it left the wash bay and returned to the terminal. The passengers re-boarded to continue their journeys.

Ms. Easley is a 34-year-old African-American mother from Louisville, Kentucky. It appears that she is the sole economic provider and caregiver for her family. In early March, 2016, she was in a desperate financial situation when she got an offer for a job that would pay $1,000. The Court does not know how much Ms. Easley was earning in Kentucky, where she worked at a chain restaurant. But the weekly take-home pay—that is, pay after deductions for Social Security and Medicare taxes—for a minimum wage job in the United States during this time period was around $267.80.[2] It would take a person earning the minimum wage more than 149 hours of remunerated work to earn what Ms. Easley was offered for this job.[3]

William Schultz—a friend in Kentucky whom she had known for about a year and a half—knew that Ms. Easley needed money. He gave Ms. Easley's number to a woman who called to offer her the job. The woman said that Ms. Easley would earn $1,000 for flying out to California and returning to Louisville on a Greyhound bus. Beyond those details, Ms. Easley did not know what the job would involve and she did not ask the woman for more information. Mr. Schultz gave Ms. Easley money for her airline ticket, which she purchased with her own debit or credit card. She flew to Ontario, California, where Mr. Schultz (who had traveled from Kentucky to California on an earlier plane) and the woman met Ms. Easley at the airport and took her to the woman's apartment.

---

[2] Nick Wing, "17 Numbers That Will Make You Realize Just How Pathetic The Federal Minimum Wage Is," *Huffington Post*, Sept. 24, 2014, http://www.huffingtonpost.com/2014/09/24/minimum-wage-increase-numbers_n_5868848.html.
[3] *Id.*

Drug Enforcement Agency (DEA) Special Agent (SA) Jarrell Perry works to detect and intercept both illegal drugs and proceeds from the sales of illegal drugs at hubs of public transportation in Albuquerque: the bus station, the Amtrak train station (which is connected to the bus station), at packaging services, and sometimes at the international airport. SA Perry has more than nineteen years of experience with the DEA. He has interdicted illegal drugs and proceeds from sales of illegal drugs for almost eighteen of those nineteen years—at the Greyhound station in Albuquerque for six or seven of those nineteen years.

On March 10, 2016, SA Perry was at the Greyhound station in Albuquerque. Before SA Perry arrived at the bus station, he had received a passenger list from Greyhound. In reviewing the list, SA Perry observed that two passengers—Ms. Easley and a woman called "Denise Moore"—were traveling under the same reservation number. Their tickets had been paid for in cash and, according to the passenger list, both women had one piece of checked luggage, that is, luggage traveling in the cargo area of the bus. [Doc. 21 at 2].

That day, the other agent with whom SA Perry typically works was on vacation. Another DEA agent, Scott Godier, was SA Perry's backup. Agent Godier does not typically work in interdiction. The two agents were in street clothes, their shirts were untucked. SA Perry was carrying a weapon, but his shirt was covering it. SA Perry believes that Agent Godier was also carrying a weapon, but he (SA Perry) did not see it.

The two agents watched the bus from Claremont pulling into the Greyhound station in Albuquerque. They watched the passengers disembark from the bus. The bus went to the wash bay. While the bus was in the wash bay, SA Perry and Agent Godier "observed" the luggage that was stored underneath the bus. Ms. Easley's counsel notes that the extent of the agents' observations in the luggage hold is unknown. [Doc. 20 at 2]. In the Preliminary

Examination/Detention Hearing on March 14, 2016, SA Perry testified that he "opened up the luggage bins[,] . . . looked at the luggage[, and] looked at the tags." [Doc. 23 at 10:11–13]. According to the government, SA Perry observed two pieces of luggage—a grey-colored Rome Essentials-brand suitcase with a luggage tag displaying Ms. Easley's name and a black-tan-colored G-brand suitcase with a luggage tag displaying the name of Denise Moore. Both luggage check-in tags listed Claremont, California, as the city of origin, and a Louisville, Kentucky, as the final destination. The two luggage tags also listed an identical contact phone number. [Doc. 21 at 2–3].

After the bus was washed and refueled, Ms. Easley and the other passengers re-boarded. As she was returning to her seat, Ms. Easley saw Agent Godier at the front of the bus and SA Perry at the rear of the bus. SA Perry was questioning other passengers.

According to Ms. Easley, after SA Perry had questioned about 15 passengers and searched numerous passengers' belongings, he approached Ms. Easley. In the Preliminary Examination/Detention Hearing on March 14, 2016, SA Perry testified that he "spoke with each passenger" and estimated that there were "maybe 35, 40" passengers aboard the Greyhound bus that day. [Doc. 23 at 14:17–18, 24]. The recording of SA Perry's conversations with passengers clearly demonstrates that different passengers were subjected to different levels of inquiry. For example, some passengers were only asked where they boarded, where their final destination was, and whether they would consent to a search of their belongings, although SA Perry did not actually search these passengers. [Doc. 34 at 4]. Defense counsel points out that "[i]t is not at all clear how Agent Perry decided which passengers would be subject to which level of inquiry. Every passenger on the bus began their travel in a source city for narcotics. Every passenger (except the two traveling to Fort Worth, TX) were traveling to a destination city for narcotics."

[Doc. 34 at 5]. However, "what is clear is that most of the people who were asked to produce their ticket and identification and who were ordered to submit to a search of their person were Hispanic surname individuals and Ms. Easley, who is an African-American." *Id*. According to the government, SA Perry had his recording device activated during his questioning of the passengers, including Ms. Easley. [Doc. 21 at 3]. The recording of these interactions reveals that not a single passenger on Ms. Easley's bus declined to speak with SA Perry, and that everyone who was asked to do so gave consent for SA Perry to search their person and belongings. A Latino passenger apparently even consented to SA Perry's cutting into his stiff shoe with a knife that SA Perry borrowed from another passenger.

According to Ms. Easley, when SA Perry spoke to her, he asked her:

(1) where she was traveling from; (2) where she was traveling to; (3) if she was traveling alone; (4) if she had checked luggage stored underneath in the cargo hold of the bus; (5) if he could search her checked luggage stored underneath in the cargo hold of the bus; (6) if she had any personal belongings stored in the overhead bin of the bus; and, (7) if he could search her personal belongings.

[Doc. 20 at 3]. According to the government, Ms. Easley told SA Perry that she was not traveling with anyone. Ms. Easley also identified a backpack, pillows, and a checked-in suitcase as the items belonging to her. [Doc. 21 at 3]. The government and Ms. Easley agree that Ms. Easley "consented to a search of all of her belongings." [Doc. 20 at 3]. While on the bus, SA Perry saw her ticket, searched her backpack and pillow, asked Ms. Easley to open her jacket and if he could search her waist and around her legs. Ms. Easley complied with these requests. [Doc. 34 at 6]. After SA Perry finished speaking with each passenger, he exited the bus, pulled luggage out of the cargo hold, removed Ms. Easley's suitcase and the G-brand suitcase, then reboarded and asked Ms. Easley to step off the bus. Once she had exited the bus, SA Perry asked to see her ticket and again asked her about her travel plans. [Gov. Ex. 1(A) at 38:9–15]. He then asked to see her identification and to search her purse. *Id*. at 39:23, 40:17. Next, SA Perry asked Ms.

Easley to identify her suitcase. Then SA Perry asked Ms. Easley if she also owned the G-brand suitcase, to which Ms. Easley responded that it was not hers and that she did not know who it belonged to. *Id.* at 41:7–42:4. She then reboarded the bus. After confirming with the bus driver that the other passenger on Ms. Easley's reservation had not boarded the bus, SA Perry concluded that the G-brand suitcase had been abandoned and proceeded to search it. He cut into the suitcase and discovered methamphetamine. SA Perry then reboarded the bus and arrested Ms. Easley. The bus then departed, sometime later than its scheduled departure.

Agent Godier transported Ms. Easley to the DEA District Office in Albuquerque. According to Ms. Easley, while he was transporting her, Agent Godier asked her questions about the offense and warned her that she was facing a prison sentence of ten years to life. [Doc. 34 at 8].

At the DEA District Office, SA Perry interrogated Ms. Easley. The government provided a video of the interrogation and a transcript of the video. [Gov. Ex. 2(A)]. The parties dispute what happened before the recorded interrogation—specifically, what SA Perry told Ms. Easley about the potential charges against her, her right to be represented by an attorney, and her potential exposure to incarceration. According to Ms. Easley, after she was placed in a holding cell, SA Perry removed her from the holding cell, showed her the methamphetamine that had been seized, told her that she was facing a sentence of ten years to life imprisonment, "and then he told he[r] that she needed to be selfish, that she needed to think about her kids, that the people who supplied her with the drugs would not care about her and, most important, that she needed to 'help herself.'" [Doc. 34 at 8]. Ms. Easley says that she was then returned to the holding cell and, sometime later, removed again by SA Perry to take her photograph, fingerprints, and obtain personal information. During this processing, according to Ms. Easley, SA Perry told her that she

was "not getting out," that he wanted to interview her, and that, again, she needed to be "selfish" and "help" herself. *Id.* at 9. Ms. Easley recalls that SA Perry told her "she could help herself by consenting to an interview because if she cooperated he would tell the judge that she was a good person but if she failed to cooperate he would be forced to tell the judge that she was not worthy of leniency." *Id.* at 9. At the hearing, SA Perry testified to telling Ms. Easley that "if she decided to cooperate to help herself, that her consideration, anything that she did, would be relayed to the U.S. Attorneys who would relate it to the Judge, who would make the final decision of what happened to her." [Hearing Tr. at 100:11–15].

SA Perry returned Ms. Easley to the holding cell and then, sometime later, removed her again and took her to an interview room where he conducted a tape-recorded conversation. The following is an excerpt of the interrogation near the beginning of the recording, after SA Perry read Ms. Easley her Miranda warning.

SA Perry:     You kind of had a puzzled look on your face. Do you -- do you want me to read that again? Do you understand it?

Ms. Easley:   I understand it, but I'm just like I want to help but I'm like --

SA Perry:     Well, let me finish. Let me finish reading your rights. You understand that one, though, right? Let me read it to you again. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. Do you understand that?

Ms. Easley:    Yes.

SA Perry:     Okay. If you cannot afford a Lawyer one will be appointed to you before any questioning if you wish. Do you understand that?

Ms. Easley:   Yes.

SA Perry:     Do you understand everything I just read to you?

Ms. Easley:   Yes.

SA Perry:     Okay. Are you willing to answer some questions?

| Ms. Easley: | If I answer the questions now and then I answer questions with a lawyer here, how long would it that be? |
| --- | --- |
| SA Perry: | Okay. Repeat that again because I didn't understand. |
| Ms. Easley: | I said—I said how long would it be for me to answer questions with a lawyer here? |
| SA Perry: | Okay. Here's the deal, you have a right to a lawyer, okay, before you answer any questions. If you tell me that you want a lawyer right now— |
| Ms. Easley: | Uh-huh |
| SA Perry: | —we're just not going to ask you the questions today. Okay. So that's your right. We're not going to call a lawyer and bring one in here and have you question—answer questions. Okay. We're not going to do that today. If you decide you want a lawyer today we just won't ask you questions but you can—if you talk to your lawyer later and after you go to court and then you decide you want to answer questions then we'll talk to you then. Does that make sense? If it doesn't make sense let me know. |
| Ms. Easley: | It makes sense. I'm just like which one is going to help me better because I told you I don't—I can't afford to be here like this. I know what is going on but I can't afford to be here like this. |
| SA Perry: | Okay. That's your right. I—you know, all I can do is read you your rights and I can't try to talk you into talking to us. You know, I mean, as I explained to you when we was processing you, you know, I want to talk to you. The advantages of you talking to us is it'll, in the long run help you. Obviously it will help us. It will help you when it comes down to your sentencing. That's a choice you make. You can get—make a choice to talk to us and, you know, I can't make that decision for you. |
| Ms. Easley: | All right. [. . .] I'll answer the questions. |

[Gov. Ex. 2(A) at 2:24–5:13]. During the ensuing interview, Ms. Easley described how she agreed to transport luggage from Claremont, California, to Louisville, Kentucky, who she was working with and what transpired prior to her boarding the bus in Claremont. Over the course of the interview, both SA Perry and Ms. Easley made references to their earlier, unrecorded conversation while Ms. Easley was being processed, including SA Perry saying "I told you

before, we can't go back and change anything we did," *id*. at 24:4–5, and Ms. Easley saying "like you already said, I'm not going to get out anyways," *id.* at 21:23–24. After the recorded interview, Ms. Easley was eventually transported to the Sandoval County Detention Center in Bernalillo, New Mexico.

## PROCEDURAL BACKGROUND

On March 23, 2016, Ms. Easley was charged in a one-count Indictment [Doc. 12] with possession with intent to distribute more than 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(A)(1) and 841(B)(1)(a). On May 23, 2016, she filed the instant Motion to Suppress [Doc. 20], arguing that SA Perry had violated her rights under the Fourth, Fifth, and Sixth Amendments to the U.S. Constitution, and sought to suppress the evidence that SA Perry seized from the G-brand suitcase, as well as her subsequent custodial statements. On June 2, 2016, the United States filed a Response in opposition to Ms. Easley's Motion to Suppress. [Doc. 21]. On July 19, 2016, Ms. Easley filed a Reply to the United States' Response. [Doc. 30]. On August 24, 2016, the Court held a suppression hearing. SA Perry and Ms. Easley testified at the hearing. At the conclusion of the hearing, the Court ordered the parties to file written closing statements. The United States filed its written closing on August 31, 2016, and Ms. Easley filed her written closing on September 6, 2016. [Docs. 33, 34].

## STANDARD

When ruling on a motion to suppress, the Court must state its essential findings on the record. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d)'s purposes. The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which

requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[ ] 104(a) ..., the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock,* 415 U.S. 164, 174 (1974))). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

The Fourth Amendment protects "the right of the people to be secure in their . . . effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search implicating the Fourth Amendment occurs when the government invades a person's "legitimate expectation of privacy." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). A search undertaken without a warrant, subject only to a few, well-established exceptions, is *per se* unreasonable under the Fourth Amendment. A seizure implicating the Fourth Amendment occurs when the government meaningfully interferes with an individual's possessory interests in their property. *See, e.g., U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984). When a defendant moves to suppress evidence obtained as a result of an allegedly unconstitutional search, she has the burden of demonstrating a subjective expectation of privacy that society is prepared to recognize as reasonable. *See United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995).

The Fifth Amendment protects a person from being compelled to incriminate herself. U.S. Const. amend. V. The Fifth Amendment specifically prohibits admitting statements given by a person during a custodial interrogation without *Miranda* warnings. Moreover, "when an

accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights[.]" *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). The Supreme Court later explained that a person "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. U.S.*, 512 U.S. 452, 459 (1994). Without this "level of clarity, *Edwards* does not require that the officers stop questioning the suspect." *Id.* at 458.

## DISCUSSION

Ms. Easley seeks to suppress evidence seized from the G-brand suitcase as well as the recorded statement she made to SA Perry at the DEA office. [Doc. 20 at 1]. As described herein, Ms. Easley has not established by a preponderance of the evidence that, while in the wash bay, SA Perry searched her bags in violation of the Fourth Amendment. Nor has Ms. Easley established that she and the bus were subject to an unreasonable investigatory detention. However, the government has not established by a preponderance of the evidence that, under the totality of the circumstances, Ms. Easley's consent to search and abandonment of the G-brand suitcase were voluntary. Accordingly, the evidence seized from the suitcase will be suppressed. Furthermore, because Ms. Easley's confession is tainted by the earlier Fourth Amendment violation, the confession also will be suppressed.

### I.     Evidence Seized From the G-Brand Suitcase

The pre-search that SA Perry conducted in the wash bay does not run afoul of the Fourth Amendment because the testimony indicates that SA Perry and Agent Godier were only making visual observations of the luggage and their tags, and not otherwise manipulating the bags.

However, in considering the totality of the circumstances in the encounter between SA Perry and Ms. Easley, the Court finds that Ms. Easley's consent to the search of her suitcase and her abandonment of the G-brand suitcase were not voluntary.

### A. Pre-Search of Checked Bags After Bus Arrived in Wash Bay

Ms. Easley argues that when the bus was in the wash bay and SA Perry and Agent Godier were making observations about the luggage in the cargo hold of the bus, the agents' "actions went far beyond the sort of occasional touching that a person expects as a passenger on the bus." [Doc. 20 at 12]. Instead, the agents undertook their observations of the luggage "with the improper aim of 'discovering the nature of the contents of the bag.'" *Id.* (citing *U.S. v. Nicholson*, 144 F.3d 632, 638 (10th Cir. 1998)).

People have a legitimate expectation of privacy in their personal luggage—one which the Fourth Amendment protects. *See U.S. v. Nicholson*, 144 F.3d 632, 636 (10th Cir. 1998) (citing *United States v. Chadwick*, 433 U.S. 1, 13 (1977) ("individual has expectation of privacy in luggage as repository of 'personal effects'"), *overruled in part on other grounds, California v. Acevedo*, 500 U.S. 565 (1991)).

However, a traveler's expectation of privacy in her luggage has limits. Merely conducting a visual inspection of what is in "plain view" does not constitute a search under the Fourth Amendment. *See Nicholson*, 144 F.3d at 636 (citing *Arizona v. Hicks*, 480 U.S. 321, 328 (1987)). Moreover, although "[e]very search necessarily involves the use of sensory perception," "the use of sensory perception does not necessarily constitute a search." *Id*. at 636. The Tenth Circuit has held, for example, that "an officer's kicking and lifting of a gym bag located on the floor in front of a train seat, and protruding into the aisle, did not constitute a search." *Id.* at 636–37 (citing *U.S. v. Gault*, 92 F.3d 990 (10th Cir. 1996)). The thrust of the analysis is whether the

government officer's "manner of handling the bag was the sort that a traveler leaving the bag in such a position might reasonably expect." *Id*. at 637.

In *Nicholson*, the detective testified that he removed Mr. Nicholson's carry-on bag from the overhead rack and "manipulated" it. *Id*. at 635. In manipulating the bag, he detected "tightly wrapped bundles[,]" which he believed to be illegal drugs. The Tenth Circuit found that because the manner of the detective's manipulation of the bag was one that "Defendant did not reasonably expect from other passengers," the detective conducted a search within the meaning of the Fourth Amendment. *Id.* at 639. Specifically, the Court noted:

> Detective Leach was not prepping the bag for a sniff. He never testified that he smelled Defendant's bag. Instead, Detective Leach worked Defendant's bag to determine whether it contained something of independent evidentiary value. Unlike a sniff, manipulating a bag with the hands may reveal much more than simply the likely presence of illegal drugs. To an extent, it reveals the contents of a bag, for example clothes, shoes, or toiletries, in which the owner has a legitimate expectation of privacy.

*Id.* The Court concluded:

> We believe that by handling Defendant's carry-on bag in this manner, Detective Leach departed from the type of handling a commercial bus passenger would reasonably expect his baggage to be subjected, and entered the domain protected by the Fourth Amendment. When Detective Leach removed Defendant's carry-on bag from the overhead rack and conducted a tactile examination aimed at discovering the nature of the contents of the bag, he violated Defendant's reasonable expectation of privacy in the bag. Thus, Detective Leach's manner of handling Defendant's carry-on bag constituted a search within the meaning of the Fourth Amendment.

*Id.* The Court similarly found that another detective's manner of handling the defendant's checked suitcase in the cargo hold of the bus constituted a search, where the detective testified that he pressed on the sides of the bag "with his hands perpendicular to the ground and flat." *Id.* at 640. By pressing on the sides, he detected "several large bundles" inside it. The Court found that "Detective Wenthold's pressing on the sides of the suitcase with the palms of his hands in

order to inspect its contents violated Defendant's reasonable expectation of privacy in the suitcase because it went beyond that type of contact which a passenger may reasonably expect when checking a bag with a commercial bus line." *Id.* at 640.

According to his testimony, it does not appear that SA Perry touched, squeezed, or otherwise manipulated the G-brand luggage when it was in the cargo hold underneath the bus— that is, it does not appear that SA Perry's actions amounted to an unconstitutional search. SA Perry claimed that while he was in the wash bay, he "opened up the luggage bins, [and] looked at the luggage." [Doc. 23 at 10:11–13]. SA Perry also testified that he "[h]ad to move some of the luggage to get to all of the luggage" and he "looked at the tags[.]" *Id.* at 10:12–13. He did not recall removing luggage from the bus. *Id.* at 10:21. He also testified that he did not notice anything suspicious about the luggage at the time he inspected it in the wash bay. *Id.* at 13:18.

Because the record does not indicate, nor has Ms. Easley identified, any evidence that SA Perry or Agent Godier "manipulated" the G-brand suitcase in a way that "went beyond that type of contact which a passenger may reasonably expect when checking a bag with a commercial bus line," *Nicholson*, 144 F.3d at 640, the Court finds that the actions the agents took to observe the luggage in the cargo hold while the bus was in the wash bay did not constitute an unreasonable search in violation of the Fourth Amendment.

## B. Investigatory Detention

Ms. Easley argues that even if the agents' observations of the luggage in the cargo hold did not constitute an unreasonable search, the detention of the Greyhound bus was unlawful because SA Perry and Agent Godier lacked "individualized suspicion of wrongdoing" and engaged in a "suspicionless drug interdiction operation which prevented every passenger on the bus from continuing on their journey." *Id.* at 13–14 (citing *City of Indianapolis v. Edmond*, 531

U.S. 32, 41–42 (2000) for the holding that officers may not establish suspicion-less checkpoints for the primary purpose of interdicting narcotics). Ms. Easley argues that the prolonged detention of the bus was unreasonable and "unquestionably exceeded the permissible duration of an investigative detention[.]" *Id.* at 18. She argues that SA Perry "transformed a routine stop in Albuquerque for washing and [refueling] into a drug interdiction checkpoint, in violation of the Fourth Amendment." *Id.* at 19 (citing *U.S. v. Nicholson*, 144 F.3d at 639).

The Court rejects Ms. Easley's argument that the bus and its passengers experienced an unreasonable investigative stop. Although the bus may have been delayed in departing the Albuquerque station due to the agents' activities, the agents' detention of Ms. Easley and the other bus passengers was not unreasonable. An investigative detention is reasonable under the Fourth Amendment if the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity," *Oliver v. Woods*, 209 F.3d 1179 (10th Cir. 2000), and if the detention is "reasonably related in scope to the circumstances" justifying the stop. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). In other words, the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out." *United States v. Holt*, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc), *overruling on other grounds recognized in United States v. Stewart*, 473 F.3d 1265 (10th Cir. 2007).

In considering the agents' activities on the Greyhound bus in this case, the evidence suggests that the agents were attempting to conduct consensual searches and not conducting an investigatory stop of the bus. Neither counsel nor the Court has identified a case where law enforcement questioning passengers on a bus or train, during one of its scheduled stops, was considered an investigatory stop. Rather than stopping the bus outside of its schedule, SA Perry and Agent Godier boarded the bus during one of its regularly scheduled stops and spoke to

passengers in an effort to conduct consensual searches. Everyone agreed to speak to SA Perry and no one declined consent to be searched. Because all of the agents' actions on the bus were based on consent, the factual setting of this case does not raise the issue of whether SA Perry and Agent Godier had reasonable suspicion to conduct a stop and frisk type search of Ms. Easley or others on the bus. *See also United States v. Bostick*, 501 U.S. 429, 437 (1991) ("no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required.").

### C.  Consent to Search G-brand Suitcase

The Court considers the totality of the circumstances in the encounter between SA Perry and Ms. Easley and finds that a person in Ms. Easley's position would not have felt free to terminate the encounter and that, accordingly, Ms. Easley's abandonment of the G-brand suitcase was involuntary and the methamphetamine obtained from the suitcase must be suppressed.

In general, a warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment. *U.S. v. Trimble*, 986 F.2d 394, 399 (10th Cir.), *cert. denied*, 508 U.S. 965 (1993). However, an abandonment must be voluntary. *U.S. v. Ward*, 961 F.2d 1526, 1535 (10th Cir. 1992), *overruled on other grounds in U.S. v. Little*, 18 F.3d 1499, 1504 (10th Cir. 1994). Mere "police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary," *U.S. v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983), but property is considered involuntarily abandoned if the abandonment was a consequence of illegal police conduct. *See, e.g., U.S. v. Garzon*, 119 F.3d 1446, 1450–51 (10th Cir. 1997) (finding property not abandoned when left on bus after police issued unlawful order to remove all belongings from bus and "parade them past a drug-sniffing dog"). In sum, "[a]n abandonment is not voluntary

when it results from a Fourth Amendment violation." *U.S. v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993). When a person expressly denies having ownership of property, unless that denial of ownership is the result of a Fourth Amendment violation, it constitutes an abandonment of property. "That [a law enforcement agent] might have known [that a Defendant] previously exercised dominion over the bag is irrelevant." *See U.S. v. Denny*, 441 F.3d 1220, 1228 (10th Cir. 2006).

Ms. Easley consented to a search of her other belongings and expressly denied ownership of the G-brand luggage. The issue therefore is whether her denial of ownership over the G-brand suitcase resulted from an earlier Fourth Amendment violation. Ms. Easley argues that the abandonment of the G-brand suitcase was involuntary because she "merely acquiesced to Agent Perry's increasing show of authority," [Doc. 20 at 14], and that she was "left with the firm belief that she had no choice but to comply with each of Agent Perry's requests." *Id.* at 16. The government argues that Ms. Easley consented to speaking with SA Perry and to his search of "her backpack, her pillow and her suitcase" that was checked in the cargo hold below the bus. *Id.* at 13. In support of the argument that Ms. Easley's consent was voluntary, the government notes that she "was on a public bus, within view of persons other than law enforcement." *Id.* at 14 (citing to *U.S. v. Thompson*, 546 F.3d 1223, 1227 (10th Cir. 2008) ("[t]he presence of other citizens during a police encounter is one factor suggesting its consensual nature")). The government also notes that SA Perry did not obstruct Ms. Easley's movement on the bus or restrain her until he arrested her, he did not display his weapon, and he spoke with Ms. Easley "in a consistently polite tone of voice." *Id.* The government argues that under the Supreme Court's holding in *United States v. Drayton*, 536 U.S. 194, 204 (2002), police officers do not have to always inform people of their right to refuse a request to search. *Id.* at 15.

Furthermore, the government argues that in addition to consenting to the search of her suitcase and other belongings, Ms. Easley also "effectively consented" to the search of the so-called phantom passenger Denise Moore's suitcase, in which the methamphetamine was found. *Id.* The government argues that Ms. Easley "initially denied any relationship to the suitcase, denied knowing about it[,] and told SA Perry that she didn't care about it," *id.*, demonstrating that the G-brand suitcase had been abandoned and was legitimately subject to search. *Id.* at 16 (citing *Abel v. U.S.*, 362 U.S. 217 (1960), *inter alia*).

Voluntary consent to search is an exception to the rule that a warrantless search violates the Fourth Amendment. *United States v. Jones,* 701 F.3d 1300, 1317 (10th Cir. 2012). "Voluntary consent" consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." *Id.* In determining the voluntariness of consent, the Fourth Amendment requires that "consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion is applied, the resulting consent would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth v. Bustamonte,* 412 U.S. 218, 228 (1973). The government bears "the burden of proving that consent is given freely and voluntarily." *Jones,* 701 F.3d at 1318 (citation omitted). "Further, the question whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Id.* (citation omitted).

In *United States v. Bostick,* 501 U.S. 429 (1991), the Supreme Court specifically addressed drug interdiction efforts on buses. In *Bostick,* two police officers requested a bus passenger's consent to a search of his luggage. The passenger agreed, and the resulting search

revealed cocaine in his suitcase. The Florida Supreme Court suppressed the cocaine, adopting a *per se* rule that due to the cramped confines onboard a bus, the act of questioning would deprive a person of his or her freedom of movement and so constitute a seizure under the Fourth Amendment. The Supreme Court reversed, "ma[king] it clear that for the most part *per se* rules are inappropriate in the Fourth Amendment context." *Drayton,* 536 U.S. at 201 (citing *Bostick*). Rather, "[t]he proper inquiry necessitates a consideration of 'all the circumstances surrounding the encounter.'" *Id.* (quoting *Bostick,* 501 U.S. at 429).

The Court next noted that a passenger may not want to get off a bus if there is a risk it will depart before the opportunity to re-board. *Bostick,* 501 U.S. at 434–36. Although a bus rider's movements are confined in this sense, the circumstance of simply riding a bus says nothing about whether the police conduct is coercive. *Id.* at 436. Accordingly, the Court held that the proper inquiry "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick,* 501 U.S. at 436.

The *Bostick* Court deemed the following factors relevant to the Fourth Amendment reasonableness determination: (1) whether the agent advised the defendant he had the right to refuse consent, (2) whether the agent in any way threatened the defendant (*i.e.,* the display of a weapon and/or the nature of the questioning), and (3) the particular location of the encounter. *Bostick*, 501 U.S. at 437. Following *Bostick,* the Tenth Circuit similarly identified various factors relevant to whether a reasonable person would not feel free to terminate an encounter with police:

> The threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a

nonpublic place or a small, enclosed place; and absence of other members of the public.

*United States v. Hill,* 199 F.3d 1143, 1147–48 (10th Cir. 1999).

In *Drayton,* the Supreme Court applied the *Bostick* framework to the facts of the case before it and determined that the respondents' consent to the search of their luggage and their persons was voluntary, explaining:

> Nothing Officer Lang said indicated a command to consent to the search. Rather, when Lang requested to search Brown and Drayton's persons, he asked first if they objected, thus indicating to a reasonable person that he or she was free to refuse. Even after arresting Brown, Lang provided Drayton with no indication that he was required to consent to a search. To the contrary, Lang asked for Drayton's permission to search him ("Mind if I check you?"), and Drayton agreed.

*Drayton*, 536 U.S. at 206. The Court specifically noted that although the officer "did not inform the respondents of their right to refuse the search, he did request permission to search, and the totality of the circumstances indicates that their consent was voluntary, so the searches were reasonable." *Id.* at 207. The Court rejected not only the notion that "police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search," but also the suggestion that "a presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate." *Id.* Rather, the Court stated that "the totality of the circumstances must control, without giving extra weight to the absence of this type of warning." *Id.*

In assessing the totality of the circumstances in the instant case, the Court notes first that the factors listed in *Hill* are not exhaustive. *See United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017); *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005). Courts "'must consider all the circumstances surrounding the encounter' to determine whether consent was voluntary." *U.S. v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (quoting *Bostick*, 501 U.S. at 439). "A defendant's subjective state of mind may be relevant to some degree on the issue of the

voluntariness of his or her consent, but it is not determinative if it does not overcome other indicia that the defendant's consent was freely and voluntarily given." *U.S. v. Huerta-Rodriguez*, 2010 WL 4929044, at *10 (D.N.M. Oct. 20, 2010) (Browning, J.) (citing *Hill*).

Several of the factors listed in *Hill*, considered in isolation, would weigh in favor of finding that Ms. Easley's consent was voluntary. First, there was no "threatening presence of several officers." To the contrary, only SA Perry approached Ms. Easley, near the back of the bus, while Agent Godier remained at the front of the bus. *See United States v. Benard*, 680 F.3d 1206, 1211 (10th Cir. 2012) (finding first factor did not weigh against a finding of voluntary consent where only two police officers were present at the scene and only one of those officers approached defendant). Second, neither SA Perry nor Agent Godier "brandished" a weapon. SA Perry kept his gun and his handcuffs concealed beneath his shirt. Third, in reading the transcript of the audio recording, it would appear that SA Perry did not use "aggressive language." Fourth, SA Perry did not retain Ms. Easley's personal effects for a prolonged period of time, as he searched each item briefly and immediately returned it to her. Fifth, the recording and testimony do not indicate that SA Perry blocked Ms. Easley's access to the aisle during the encounter. Finally, the encounter occurred in the presence of other members of the public, namely, the other bus passengers.

However, in considering the totality of the circumstances, beyond the factors specifically mentioned in *Hill*, the Court finds that a reasonable person in Ms. Easley's position would not have felt free to terminate the encounter with SA Perry. First, the recording of SA Perry's interactions with passengers on the bus reflects that none of the passengers refused to speak with SA Perry, and those who were asked did consent to searches. One passenger even consented to SA Perry cutting into his shoe. [Gov. Ex. 1(A) at 13:19-14:6]. That no one declined consent

suggests that SA Perry, either verbally or nonverbally, made a show of authority that would lead a reasonable person in Ms. Easley's position to believe she was not free to decline or terminate the encounter.

In *United States v. Levetan*, 729, F. Supp. 891, 901 (D.D.C. 1990), the district court held that, where the defendant train passenger was told that police were searching others on the train and defendant understood that the train would be stopped until the officers finished their questioning and searches, a reasonable person would not believe they were free to leave. The court recognized that "[a] reasonable person is unlikely to believe that he alone can walk away from police when he is one of a group of persons being questioned." *Id*. The court further reasoned that "[t]he knowledge that police are searching a group of other persons must have at least subtly coerced Levetan into believing that the police could lawfully search his bags whether he consented or not." *Id*. at 902. Similarly, Ms. Easley witnessed SA Perry's interrogation and search of several other passengers on the bus before she was questioned, and she did not see anyone decline consent. The Court therefore gives some weight to this factor, as part of the totality of circumstances, in favor of its finding that Ms. Easley's consent was involuntary.

Second, SA Perry initiated his conversation with several passengers by saying that he was checking the bus "for security" purposes, rather than stating he was looking for contraband. [Gov. Ex. 1(A) at 4:2–3, 7:6–7, 8:9–10, 22:1–2, 25:6–7.]. Although "not all deception or trickery will render a search invalid," *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011), the Court interprets SA Perry's approach of introducing himself as a police officer who is checking the bus "for security" as an attempt to assert authority and confuse passengers into believing they could face physical danger if they did not comply with his search requests. In *Bostick*, the officers identified themselves as "narcotics agents on the lookout for illegal drugs."

*Bostick*, 501 U.S. at 431–32. In contrast, SA Perry's pattern of introducing himself as a police officer who is checking the bus "for security" may mislead so called reasonable passengers into believing they are not free to decline or terminate the encounter. *See United States v. Grobstein*, 1:13-cr-0063-MV, Doc. 129, 2016 WL 10587954, at *24 (D.N.M. Mar. 7, 2016) (Vázquez, J.) (finding that "by identifying himself as a police officer, rather than as a DEA officer, and by representing that he is there for security purposes, without clarifying that his purpose is drug interdiction, SA Perry misled and misinformed Defendant. The Court is troubled by SA Perry's obfuscation of his position and his role."); *United States v. Ruedas*, 270 F. Supp. 2d 1316, 1317 (D.N.M. 2003) (Vázquez, J.) (finding defendant voluntarily consented to the encounter with SA Perry, noting in part that SA Perry approached the defendant and "identified himself as law enforcement who investigated drug trafficking activity").

In *U.S. v. Harrison*, 639 F.3d 1273, 1278-79 (10th Cir. 2011), the Tenth Circuit held that "when government agents seek an individual's cooperation with a government investigation by misrepresenting the nature of that investigation, this deception is appropriately considered as part of the totality of circumstances in determining whether consent was gained by coercion or duress." The Court affirmed the district court's finding that consent was not voluntary where officers were investigating the defendant for selling drugs out of his apartment but told the defendant they had received an anonymous tip that there were drugs and bombs in the defendant's apartment. *Id*. at 1275-76. The Court counseled to be "especially cautious when this deception creates the impression that the defendant will be in physical danger if he or she refuses to consent to the search." *Id*. at 1279.

Similarly, in *United States v. Vaughn*, 1:11-cr-01235-MCA-1 (D.N.M. Jan. 7, 2013), Doc. 98, the Court granted the defendant's motion to suppress on the basis that SA Perry coerced

the defendant's consent to search, in part by misleading the defendant as to the purpose of his search. *Id*. at 20. The Court found that SA Perry failed to inform the defendant that he was searching for illegal narcotics, and instead informed her "that he was searching for weapons and/or explosives," to which either the defendant or her co-defendant "indicated that she felt reassured that law enforcement was being vigilant to protect their safety." *Id*. at 23. The Court also found that SA Perry failed to inform the defendant of her right to refuse consent, and that this failure "weigh[ed] in favor of the conclusion that Defendant's consent was obtained through coercion." *Id*. at 22. The Court weighed these factors and concluded that "because Perry did not clarify that Defendant did not have to consent . . . and because Perry misrepresented the reason why he wanted to search Defendant," and in light of some observations about the tone and demeanor of SA Perry, the defendant's consent to be searched was obtained through coercion. *Id*. at 24.

Here, the Court finds that SA Perry misled passengers as to the purpose of his search. The Court weighs this factor in support of its conclusion that Ms. Easley's consent to be searched and subsequent abandonment of the G brand suitcase was involuntary. On one hand, in talking to Ms. Easley specifically, SA Perry did not repeat his earlier statement to several other passengers that he was checking the bus for "security." In fact, when he asked Ms. Easley for permission to search her checked bag, SA Perry asked "Would you consent for [sic] a search of your bag for contraband, ma'am?" [Gov. Ex. 1(A) at 27:11–12]. The Court does not know whether Ms. Easley specifically overheard SA Perry's prior interactions with passengers, in which he stated five times that he was checking the bus for security purposes. On the other hand, on the audio recording you can clearly hear him telling other passengers that he is a police officer checking the bus for security purposes. What is clear is that SA Perry did not tell Ms.

Easley he was a DEA officer looking for narcotics. By being vague as to his purpose, SA Perry deprives passengers of an opportunity to understand the situation, let alone exercise their right to decline consent. Therefore, in light of the fact that all of the other passengers consented to be searched and that Ms. Easley was not informed of her right to refuse consent, the Court weighs SA Perry's misleading statement in favor of finding that Ms. Easley's consent was coerced.[4]

Third, when SA Perry reboarded and asked Ms. Easley to step off the bus for more questioning, his instructions could be interpreted as either a request or a demand, depending on contextual factors such as race, gender, and economic or social status. When SA Perry asked Ms. Easley to step off the bus, the recording indicates that he said "Excuse me, ma'am. Can I speak to you outside for one second, please? You don't have to bring any of your stuff. You can bring your purse if you'd like. Can I see your ticket one more time, ma'am? Can we step over here just to get away from this noise? Where did you say you were headed to?" [Gov. Ex. 1(A) at 38:9–15]. The government's position is that these instructions were non-aggressive and gave Ms. Easley the opportunity to decline.

The Court disagrees and, in weighing the audio recording, considers race as a relevant contextual factor. Race influences the likelihood of a person asserting their constitutional rights.

---

[4] The Court weighs SA Perry's misrepresentation differently in this case than it did in *Grobstein*, 1:13-cr-0063-MV, Doc. 129, 2016 WL 10587954. In *Grobstein*, this Court distinguished *Vaughn* and found that because SA Perry merely said he was there for security purposes and did not say he was searching for weapons and explosives, "there [wa]s no reason to believe that Defendant was less inclined to refuse SA Perry's questioning and his repeated requests for consent to search in light of his vague and ambiguous description of his purpose as 'security.'" *Id*. at 52. This Court explained that although SA Perry's misrepresentation was "a relevant factor for consideration," it did not "tip the balance in favor of finding coerced consent" when viewed within the totality of the circumstances." *Id*. at 52-3. However, the Court weighs this factor differently in the instant case because the totality of the circumstances is distinct. First, whereas Ms. Easley was present as SA Perry questioned and searched several passengers, Grobstein was only the third passenger to speak with SA Perry. Furthermore, whereas neither Ms. Easley nor any other passenger declined consent, Grobstein initially declined consent to search. Because the totality of the circumstances in the encounter between Grobstein and SA Perry indicated voluntary consent, the Court found that SA Perry's misrepresentation that he was on the bus for security purposes to be inconsequential. In the instant case, SA Perry's misrepresentation bolsters the Court's conclusion, based on several additional factors, that Ms. Easley's consent was not voluntary.

Through everyday experiences, people of color are conditioned to presume that asserting their constitutional rights in a police encounter will increase their likelihood of physical harm or arrest.[5] Given the backdrop of fear between people of color and law enforcement, the Court must consider race as a factor, rather than simply asking whether a reasonable person would feel free to leave.[6]

The Court is persuaded that it is both permissible and necessary to consider race as part of the totality of the circumstances because the Supreme Court has regarded age as a relevant factor. In *J.D.B. v. North Carolina*, 564 U.S. 261, 264–65 (2011), the Supreme Court held that "[i]t is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave. Seeing no reason for police officers or courts to blind themselves to that commonsense reality, we hold that a child's age properly informs the *Miranda* custody analysis." The Court explained that "courts can account for that reality without doing any damage to the objective nature of the custody analysis." *Id*. at 272. In

---

[5] *See, e.g.,* Devon W. Carbado, *(E)racing the Fourth Amendment*, 100 MICH. L. REV. 946, 1013–14 (2002) (". . . people of color are less likely than whites to assert their constitutional rights. Part of their racial socialization will include the idea that, in the context of encounters with the police, they should comport themselves (a) to signal racial respectability and (b) to make the officers racially comfortable. The assertion of rights can undermine that performance strategy. Specifically, it can racially aggravate or intensify the encounter, increasing the person of color's vulnerability to physical violence, arrest, or both.").

[6] As one scholar put it, "it bears reiterating that there is no race neutral position from which to conduct the 'reasonable person under the circumstances' inquiry." *Id*. at 1002. Accordingly, the imaginary "reasonable person" appears in fact to be a subjective one: a wealthy white man whose lived experience of privilege means that he is rarely stopped by police, that he knows his right to terminate a police encounter, and that he does not fear police retaliation against him for terminating the encounter. The imaginary person cannot be a person of color whose life experiences with police have conditioned her to comply with police requests—one who would reasonably fear police violence were she to terminate an encounter or decline to consent to a search. *Id*. at 977 ("As a result of this racial vulnerability, a black man, over the course of his lifetime, is likely to have several encounters with the police. During these encounters, the police may ask him to produce identification, to justify his presence at a particular location, to explain where he is traveling to and from, and to answer questions about whether he uses, distributes, or manufactures drugs. They may well ask him for permission to search his personal belongings. To the extent that these inquiries reside outside of the reach of the Fourth Amendment, police officers have virtually unbridled discretion in deciding which individuals to engage in this way."). In this sense, "[w]hen the Court asks 'whether a reasonable person would feel free to leave or otherwise terminate the encounter,' it is really asking whether a reasonable person *should* feel free to leave or otherwise terminate the encounter. . . . the legal conclusion that a reasonable person is not seized in the context of a voluntary interview is a normative position that a reasonable person *should not* feel seized." Devon W. Carbado, *From Stopping Black People to Killing Black People: The Fourth Amendment Pathways to Police Violence,* 105 CAL. L. REV. 125, 141 (2017).

particular, "[p]recisely because childhood yields objective conclusions like those we have drawn ourselves—among others, that children are 'most susceptible to influence' . . . and 'outside pressures,' . . . —considering age in the custody analysis in no way involves a determination of how youth 'subjectively affect[s] the mindset' of any particular child." *Id*. at 275 (quoted authority omitted). In the same way, if courts may consider that a younger person is less likely to decline consent than an adult, without determining the child's subjective mindset, this Court may consider the "commonsense reality," backed by substantial evidence, that a person of color is also less likely to decline consent.[7] As Justice Sotomayor explains in *J.D.B.*, "[t]his is not to say that a child's age will be a determinative, or even a significant, factor in every case. . . . It is, however, a reality that courts cannot simply ignore." *Id*. at 277. This Court similarly considers Ms. Easley's race as one of several factors in assessing the totality of the circumstances surrounding her encounter with SA Perry. The fact that Ms. Easley was the only black person on the Greyhound bus bolsters the Court's conclusion that, in light of the previously discussed circumstances surrounding the encounter, Ms. Easley's consent was not voluntary.

The Court acknowledges that the Supreme Court's consideration of age is based in part on the observation that "'[o]ur history is replete with laws and judicial recognition' that children cannot be viewed simply as miniature adults," *id*. at 274, and that our history has not similarly acknowledged race. However, just as youth or age may impact a court's understanding of the totality of the circumstances, this Court must consider race in order to fully apprehend the encounter between Ms. Easley, the only black passenger on the bus, and SA Perry, a white

---

[7] The Eighth Circuit has considered additional personal characteristics of the person giving consent. *See, U.S. v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998) ("When evaluating [the totality of the] circumstances, we pay particular attention to the characteristics of the person giving consent and to the encounter from which the consent arose. . . . Relevant characteristics of the consenting party include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation.").

officer. Omitting consideration of the ways in which race influences encounters with law enforcement and insisting on a colorblind system of justice perpetuates a system in which constitutional protections are severely weakened for people of color. As Professor Devon W. Carbado explains:

> Because, for example, whites and African Americans are not similarly situated with respect to how their racial identity might affect this sense of constraint, the Court's failure to consider race is not race-neutral. It creates a racial preference in the seizure doctrine for people who are not racially vulnerable to, or who do not experience a sense of racial constraint in the context of, interactions with the police. Black people, across intraracial differences, are likely to feel seized earlier in a police interaction than whites, likely to feel "more" seized in any given moment, and less likely to know or feel empowered to exercise their rights.[8]

In other words, if race is ignored in the "free to leave" test, "people who are especially vulnerable to police encounters because of their race are systematically disadvantaged in comparison to people who are not."[9] At least one appellate judge has stated in dissent that racial context must be considered in the totality of the circumstances analysis:

> Whether the courts speak of it or not, race is a factor that has for many years engendered distrust between black males and law enforcement personnel. . . . I respectfully venture to suggest that no reasonable innocent black male (with any knowledge of American history) would feel free to ignore or walk away from a drug interdicting team.

*In re J.M.*, 619 A.2d 497, 512–13 (D.C. 1992) (Mack, J., dissenting).[10] This Court similarly finds that it must consider race in weighing the totality of the circumstances as to whether someone in Ms. Easley's position would have felt free to leave, in order to ensure that Fourth Amendment protections apply equally to people of color.[11]

---

[8] Carbado 2016, *supra n.6*, at 142.

[9] Carbado 2002, *supra n.5*, at 1003.

[10] *See also J.D.B.*, 564 U.S. at 281 ("To hold, as the State requests, that a child's age is never relevant to whether a suspect has been taken into custody—and thus to ignore the very real differences between children and adults—would be to deny children the full scope of procedural safeguards that *Miranda* guarantees to adults.").

[11] In considering race as a relevant contextual factor, the Court is not relying on Ms. Easley's subjective impressions. The Court considers only the perspective of people of color more broadly, which, particularly in light of the elevated consciousness of these issues in recent years, is readily apparent to law enforcement officers. *United*

Accordingly, because the Court is tasked with assessing "all the circumstances surrounding the encounter," *Bostick,* 501 U.S. at 429," the Court views SA Perry's request to speak with Ms. Easley outside the bus as an assertion of law enforcement authority that would make a reasonable person of color feel that they are not free to decline or terminate the interaction. The government argues that SA Perry's words, on paper and in isolation, are not coercive. However, this Court must consider the context in which these statements were made, in order to properly weigh the totality of the circumstances. In the context of an interaction between a white officer and the only black person on the bus, taking place after a stream of passengers have already agreed to answer questions or be searched, and after SA Perry has repeatedly misrepresented his purpose, the Court considers SA Perry's words and instructions to Ms. Easley to have authoritative and coercive force.

For example, while searching Ms. Easley's purse, SA Perry asks if he can set it down and then says "Some people are picky about their stuff." [Gov. Ex. 1(A) at 40:23–24]. This comment communicates to someone who is less likely to assert her rights that she should be permissive and cooperative. Furthermore, when SA Perry turns to show the G-brand bag to Ms. Easley he starts by saying "Okay. I'm recording" and asks Agent Godier to hand him the G-brand bag. *Id.* at 41:10. Regardless of SA Perry's reasons for stating that the recording device was on, this comment would put a reasonable person of color on notice that the conversation was significant enough to be recorded, making it even more unlikely that she would feel free to terminate the conversation.

---

*States v. Rogers*, 391 F.3d 1165, 1169 (10th Cir. 2004) ("This reasonable person 'does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer.'") (quoted authority omitted); *United States v. Abdenbi*, 361 F.3d 1282, 1292 (10th Cir. 2004) (finding that the suspect's subjective state of mind "is wholly irrelevant and plays no role in [the Court's] evaluation of the circumstances surrounding the encounter.").

As Justice O'Connor explains in *Bostick*, courts are charged with enforcing constitutional protections and may not take policy positions on the war on drugs. *Bostick*, 501 U.S. at 439. Indeed, "[t]he Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation. . . . We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.*

Consistent with *Bostick*, no single factor is dispositive or receives extra weight in the Court's reasoning. However, the Court is concerned that (1) SA Perry misrepresented his purpose, (2) SA Perry did not inform Ms. Easley of her right to refuse consent, (3) all of the passengers agreed to answer SA Perry's questions and, among those who were asked to consent to searches, all agreed to searches of their belongings, including cutting into a shoe, and (4) as the only black person on the bus, Ms. Easley was less likely to assert her constitutional rights. This combination of circumstances leads the Court to conclude that Ms. Easley's consent was not voluntary. Although SA Perry is not required *per se* to inform passengers of their right to refuse consent, the Court may give weight to this factor in combination with the other circumstances of the encounter. *Bostick*, 501 U.S. at 439–40 (finding that "[t]he Florida Supreme Court erred in adopting a *per se* rule" and that courts "must consider all the circumstances surrounding the encounter"). Furthermore, in accordance with *Drayton*, the Court does not give "extra weight" to the absence of a warning regarding Ms. Easley's right to refuse consent. The Court gives this factor weight in combination with the other circumstances of the encounter. "Although government agents are not required to advise a defendant that he or she has a right to

refuse consent to search, this is one factor considered in the totality of circumstances." *Harrison*, 639 F.3d at 1279.

Under this set of circumstances, the Court finds that the encounter was coercive and that the government has not shown by a preponderance that an individual in Ms. Easley's position would feel free to leave. In short, because people of color are less likely to assert their constitutional rights, Fourth Amendment protections may only become meaningful when they are given the opportunity to meaningfully comprehend both the officer's purpose and their right to refuse consent. *See J.D.B.*, 564 U.S. at 281 ("To hold, as the State requests, that a child's age is never relevant to whether a suspect has been taken into custody—and thus to ignore the very real differences between children and adults—would be to deny children the full scope of procedural safeguards that *Miranda* guarantees to adults.").

Accordingly, because Ms. Easley has established that her abandonment of the G-brand suitcase resulted from an earlier Fourth Amendment violation, the Court must find that her abandonment of the suitcase was involuntary and SA Perry's search of the suitcase was therefore unreasonable. Because the search of the suitcase was in violation of the Fourth Amendment, the methamphetamine discovered as a result of the search shall be suppressed.

## II. Ms. Easley's Statement at the DEA District Office

Ms. Easley argues that when she asked SA Perry, "How long until my lawyer gets here?" she was unambiguously invoking her right to counsel and the interrogation should have ceased. [Doc. 20 at 21]. She argues further that because SA Perry proceeded with the interrogation, any statement she made after her invocation of her right to counsel must be suppressed. *Id.*

Ms. Easley also argues that her statement was not voluntary because SA Perry said that he could "help her" or tell the judge she was a "piece of shit." *Id.* at 23–24. Ms. Easley argues

these statements indicated that SA Perry was promising leniency in exchange for Ms. Easley's confession. *Id.* at 22–24 (citing to *U.S. v. McCullah*, 76 F.3d 1087, 1101 (10th Cir. 1996) ("A defendant's confession is involuntary if the government's conduct causes the defendant's will to be overborne and his capacity for self-determination critically impaired.")).

The government argues that Ms. Easley's statement was voluntary because Ms. Easley was a thirty-three-year-old adult, she was not handcuffed during the interrogation at the DEA office, and SA Perry "began his recorded, custodial interview" by reading Ms. Easley her *Miranda* rights. [Doc. 21 at 17]. The government underscores that after Ms. Easley asked about a lawyer, SA Perry specifically said that if she wanted a lawyer, he would stop asking her questions until a lawyer was secured for her. *Id.* at 18. The government characterizes Ms. Easley's question about a lawyer as an ambiguous statement, which does not invoke her fifth amendment rights because the Supreme Court has held that an invocation must be unambiguous and clear. *Id.* at 18 (citing *Davis v. U.S.*, 512 U.S. 452, 458–59 (1994)).

However, when a person's arrest violates the Constitution, a *Miranda* warning alone is not enough to purge a confession of the taint of the illegal arrest—that is, the Fourth Amendment violation. *See, e.g., Brown v. Illinois*, 422 U.S. 590, 603 (1975) ("It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the Miranda warnings, alone and per se, cannot always make the act sufficiently a product of free will [to] break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."). The Supreme Court in *Brown* "announced the following factors to consider when evaluating a confession made following an illegal arrest: [1] a valid *Miranda* advisement, [2] the time lapse between the arrest and the confession, [3] any intervening circumstances, and [4] any official

misconduct." *U.S. v. Pullin*, 17 Fed. Appx. 867, 869 (10th Cir. 2001) (affirming that the confession was sufficiently attenuated from the illegal arrest where *Miranda* warnings were given and the defendant did not allege any official misconduct) (citing *Brown*, 422 U.S. at 603–04). *See also Dunaway v. New York*, 442 U.S. 200 (1979) (reiterating the holding in *Brown* in holding that confession following unlawful seizure was inadmissible); *Taylor v. Alabama*, 457 U.S. 687 (1982) (same); *Kaupp v. Texas*, 538 U.S. 626 (2003) (same).

In *Brown*, the Court found that the confession was not sufficiently attenuated from the illegal arrest because less than two hours had elapsed since the defendant's arrest and confession, there were no intervening events, and the arrest without probable cause had a "quality of purposefulness" in that it appeared to be an "expedition for evidence" undertaken "in the hope that something might turn up." *Brown*, 422 at 605. The burden is on the government to show that the confession is admissible. *Brown*, 422 U.S. at 604.

The Court considers the factors under *Brown* and finds that although Ms. Easley received *Miranda* warnings, her confession remains tainted by the earlier Fourth Amendment violation. *Kaupp*, 538 U.S. at 633 ("we held in *Brown* that *Miranda* warnings, *alone* and *per se*, cannot always . . .break, for Fourth Amendment purposes, the causal connection between the illegality and the confession.") (internal quotation marks omitted).

Regarding the second factor, the time lapse between the arrest and the confession, Ms. Easley testified, consistent with SA Perry's testimony, that upon arrival at the DEA office Ms. Easley was strip searched, processed, and waited in a holding cell for around an hour in total before SA Perry initiated the recorded interview. [Hearing Tr. at 120:14–16]. In a concurring opinion, Justice Stevens stated that "[t]he temporal relationship between the arrest and the confession may be ambiguous," depending on any intervening circumstances. *Dunaway*, 442

U.S. at 220 (Stevens, J., dissenting). The Court considers intervening circumstances separately but notes that there does not appear to be a substantial passage of time between the arrest and the confession. *See U.S. v. Cooper*, 103 F. Supp. 3d 1286 (D.N.M. 2015) (Vázquez, J.) (finding that the confession was not sufficiently attenuated from the defendant's illegal arrest where less than an hour elapsed between the arrest and confession); *United States v. Maez*, 872 F.2d 1444, 1455-56 (10th Cir. 1989) (thirty minutes held insufficient to remedy illegal arrest); *Taylor,* 457 U.S. at 691 (holding that confession was not sufficiently attenuated where six hours elapsed between illegal arrest and confession). Here, the short lapse in time between the arrest and confession weigh against finding attenuation.

Regarding the third *Brown* factor, intervening circumstances, the record does not present any intervening circumstances weighing in favor of attenuation. *See, e.g., United States v. Fox*, 600 F.3d 1253, 1260 (10th Cir. 2010) ("Some examples of intervening circumstances include carefully explain[ing] a consent form and advising an individual of the right to withhold consent," or "release from custody, an appearance before a magistrate, or consultation with an attorney.") (internal quotation marks and citations omitted). Before the recorded interview, Ms. Easley was informed that the G-brand suitcase contained methamphetamine. However, the Supreme Court has indicated that "merely confronting the accused with evidence of [her] guilt in an effort to elicit an incriminating response" does not break the causal chain between the illegal arrest and confession. *Barry v. New Jersey*, 454 U.S. 1017, 1020 (1981) (White, J., dissenting in the Court's denial of certiorari) (citing *Brown*, *inter alia*). If anything, the earlier coercive dynamic between SA Perry and Ms. Easley may have continued after the Fourth Amendment violation. Both SA Perry and Ms. Easley testified that SA Perry made several statements to her during processing that she could be facing a life sentence, that he could make a positive or

negative recommendation to the sentencing judge, and that Ms. Easley needed to help herself. [Hearing Tr. at 99:21–100:15; 121:20–24]. The government has not identified any intervening circumstances weighing in favor of attenuation.

Regarding the final factor, any official misconduct, Ms. Easley's testimony about what SA Perry said to her between her arrest and the recorded interview raises concern that Ms. Easley may have been further coerced to confess. As Justice Stevens explains in his concurrence in *Dunaway*, "[t]he flagrancy of the official misconduct is relevant . . . insofar as it has a tendency to motivate the defendant." 442 U.S. at 220. Given that the Court found Ms. Easley to be credible, the Court is not predisposed to find SA Perry's testimony more credible than Ms. Easley's solely on the basis that Ms. Easley is the defendant.[12]

Indeed, the recorded interview supports Ms. Easley's testimony that SA Perry and Ms. Easley did discuss her situation between her arrest and the recorded interview. *See, e.g.*, Gov. Ex. 1(A) 9:7–10 (SA Perry asked Ms. Easley the purpose of her trip to Ontario, to which she replied "To meet up with the lady that I told you about"); *id.* at 21:21–22:23 (Ms. Easley said ". . . like you already said I'm not getting out anyways," to which SA Perry responded "I never said you're not going to get out. I—I explained four things to you what could happen to you about the—I don't make the decision."). In light of the conflicting credible testimony about what was said in the conversation before the recorded interview, the government has not established under *Brown* that Ms. Easley's confession was sufficiently attenuated from the earlier Fourth Amendment violation. If anything, the coercive dynamic between SA Perry and Ms. Easley may have persisted if not magnified before the recorded interview began. As the Supreme Court has explained, admitting Ms. Easley's confession after she was coerced into abandoning the G-brand

---

[12] Evaluations of witness credibility, the weight to be given to evidence, and any inferences to be drawn from the evidence are determinations within the sound discretion of the district court. *See, e.g., United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997); *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996).

suitcase "would allow law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth." *Dunaway*, 442 U.S. at 219 (quoted authority omitted).

Because the government has not shown that the causal connection between Ms. Easley's illegal arrest and her recorded confession was broken, the Court finds that Ms. Easley's recorded statement was a product of her illegal arrest and must be suppressed.

## CONCLUSION

The Court must faithfully apply the Fourth Amendment in order to ensure equal protection for all. Ignoring the fear-infused racial dynamics in a police encounter weakens if not eviscerates Fourth Amendment protections for people of color. Because the Tenth Circuit instructs courts to consider the totality of the circumstances, so long as it does not rely on the subjective perspective of the defendant, the Court must consider race as one of numerous contextual factors in the same way that the Supreme Court has considered age. In combination with the other characteristics of this encounter, in which SA Perry obfuscated his purpose as well as Ms. Easley's rights, the government has not shown that Ms. Easley's consent was voluntary. The Court's ruling today is a straightforward application of the prescription in *Bostick* and, like *Bostick*, declines to find a *per se* rule that all encounters with people of color are coercive.

For the foregoing reasons, the Court **GRANTS** Ms. Easley's Motion to Suppress [Doc. 20] in its entirety.

Dated this 10th day of January, 2018.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE